UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHANIEL MARCUS GANN,<br><br>        Plaintiff,<br><br>    vs.<br><br>VALLEY STATE PRISON, et al.,<br><br>        Defendants. | **1:19-cv-01797-DAD-GSA-PC**<br><br>**FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT FOR FAILURE TO EXHAUST REMEDIES BE GRANTED**<br>**(ECF No. 49.)**<br><br>**OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS** |

I.      BACKGROUND

        Plaintiff Nathaniel Marcus Gann is a state prisoner proceeding *pro se* and *in forma pauperis* with this civil rights action pursuant to 42 U.S.C. § 1983.[1]  This case now proceeds with Plaintiff's First Amended Complaint filed on February 7, 2020, against Defendants Warden Raythel Fisher, Jr., Dining Hall Officer Paez, and Culinary Staff Members Anguiano, Chapas, Lucero, Marquez, Cruz, and Moosebaur for violation of RLUIPA, violation of the First Amendment Free Exercise Clause, and adverse conditions of confinement in violation of the Eighth Amendment; against Defendants Warden Raythel Fisher, Jr., and Moosebaur for failure

---

        [1] Plaintiff has advised defense counsel that she is transitioning.  (See ECF No. 48 at 2 fn.1.)  Accordingly, defense counsel is using feminine pronouns for Plaintiff, and the Court follows suit.

1

to protect Plaintiff in violation of the Eighth Amendment; and against Defendant Moosebaur for retaliation in violation of the First Amendment.  (ECF No. 20.)[2]

On January 28, 2022, Defendants filed a motion for summary judgment based on Plaintiff's failure to exhaust administrative remedies.[3]  (ECF No. 49.)  On March 7, 2022, Plaintiff filed an opposition to the motion.  (ECF No. 57.)  On March 14, 2022, Defendants filed a reply to the opposition.  (ECF No. 58.)

Defendants' motion for summary judgment was submitted upon the record on March 14, 2022 without oral argument pursuant to Local Rule 230(*l*), and for the reasons that follow the court finds that Defendants' motion for summary judgment should be granted.

## II.    PLAINTIFF'S ALLEGATIONS

Plaintiff is presently incarcerated at the California Institution for Men in Chino, California.  At the time of the events at issue, Plaintiff was housed at Valley State Prison (VSP) in Chowchilla, California, in the custody of the California Department of Corrections and Rehabilitation (CDCR).  Plaintiff's allegations follow:

1.      Rotten, spoiled, and otherwise unfit for human consumption food is being served in the Kosher diets. From December 26, 2016, to date, the meals are regularly served half-cooked/prepared – in particular, meat. When brought to the attention of the Culinary Supervisor Cook (CSC) and CSC II staff, the meals are not replaced.

Weekly, the Shabbat dinner is served with spoiled meat. The meat is supposed to be vacuum sealed but is served to Plaintiff open and with mold growing on it. When eaten, the meat causes illness and Plaintiff has suffered sickness from being served these meats by Defendants. Similar sickness is caused by other meats when served uncooked or opened.

*///*

---

[2] On June 7, 2021, the court issued an order dismissing all other claims and defendants from this case based on Plaintiff's failure to state a claim.  (ECF No. 30.)

[3] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).  (ECF No. 49-4.)

The turkey served in lunches is unfit for human consumption. It has been denatured by having bone ground into it. The sharp and relatively large bone shards cause damage to Plaintiff's teeth and lacerations to Plaintiff's mouth and throat.

The Kosher meal stock is delivered in a manner that causes the frozen food to spoil. It is taken from the refrigerated delivery truck and left unrefrigerated in the open sun and out in the elements at the docking area for entire shifts. Staff at the warehouse/central kitchen and culinary staff do not want to inventory the meals upon arrival. After approximately ten hours the items are finally inventoried and re-frozen. Upon need of the meals, they are again left out in the elements and sun as they are transferred where they spoil further and are refrigerated again for serving on the following day.

The internal components of the meals are open, spoiled, and otherwise contaminated. Items that are sealed, such as applesauce, cream cheese, chips, bagels, and fruit cups, are either opened by bacterial growth or by mechanical means such as crushing and then allowed to fester. When revealed to CSC staff by Plaintiff, no correction follows.

Items in the Kosher meals are stolen by inmate culinary workers. When this problem is taken directly to CSC staff by Plaintiff, Plaintiff is told, "Too bad," and left without the stolen parts of the meal. In addition, when stolen items are reported to custody staff, threats of rules violations reports being issued against Plaintiff is used as a tool of reprisal and threat to prevent further speech on the issue. Threats of violence by inmate workers against Plaintiff is also used, and correctional and custodial staff refuse to protect Plaintiff from the threats of violence. Culinary workers intentionally wear their serving gloves to the restroom and touch their "dirty dick" with their hands prior to serving the meals. CSC and custodial staff refuse to address the issue.

2.      Food is transported, opened, and cooked in shared ovens and carts that are used for non-Kosher foods. Kosher foods must be double-sealed or they are contaminated. However, daily the seals on the food are breached, either by failures during a transportation process, such as crushing and popping open of the meals, or by intentional actions of persons stealing the contents of meals. These meals are served to Plaintiff and rendered non-Kosher. These meals are

cooked in ovens used to cook non-Kosher food, even at the same time, rendering the food non-Kosher.

The sole Jewish worker, when objecting to this practice, is told by his supervisor, defendant Moosebaur, to "get into the oven" while it is still hot. Defendant Moosebaur openly states that his grandfather was a German SS wishing that all the Jews had been killed in the Holocaust.

Then the food is transported in shared carts and stored in the same shared carts with the meals open, served at the same time and placed with the non-Kosher food. The Kosher-only oven was redirected for use for regular meals, so all meals are cooked together and the Kosher oven has not been replaced.

3.      The culinary workers are not trained in the procedures mandated by the California Retail Food Code, nor by a Rabbi (necessary to serve Kosher food). The issue of training has been raised repeatedly and ignored by VSP administration as well as by the CSC staff (Defendants). The procedures for Kosher foods change every few days, perhaps not "officially," but in effect. Actual procedures are ignored and cause Plaintiff to be served non-Kosher and contaminated food.

4.      Kosher meals are served in communal areas wherein the tables are unclean both ritually and literally. The same dirty rags are used to clean the non-Kosher food and then used to clean the Kosher Diet Program (KDP) tables (when they exist), leaving chunks of non-Kosher meals smeared across the tables daily. The promised Kosher utensils are not provided and Plaintiff is required to cook many items because they are served uncooked/unprepared, but Plaintiff is not permitted by correctional staff and VSP administration to return the item to the housing unit to prepare it.

The separation of Glatt (meat) and Dairy requires the use of separate utensils, and the separation of Passover Kosher from annual/regular Kosher meals requires separate utensils. Cleaning of plastic utensils is unfeasible and therefore disposable utensils are supposed to be issued daily by Defendants but are not, further creating a barrier to the observance of Kosher by Plaintiff.

On fasting days when Plaintiff receives meals for the conclusion of the fast (three meals issued at one time), Plaintiff is instructed by both correctional and CSC staff to eat all the meals during the fasting hours or discard the meals. In this way, Plaintiff is not permitted to observe fasting holidays.

5.      When foods are rendered non-Kosher, CSC staff refuse to replace the meal. When the meal is uncooked/unprepared/frozen, CSC staff refuse to replace the meal. In both scenarios, custodial staff refuses to allow a call for a supervisor by use of threats and intimidation. Both hot dinner and breakfast trays are served frozen. Items that are not to be frozen (refrigerate-only items such as mayonnaise or cream cheese, other fluid items such as applesauce or jelly that when frozen explode in the meals and cannot be eaten, like a soda placed into a freezer) are served daily but are inedible and not replaced leaving Plaintiff with less of a meal than is reported on the menu.

While the hexure (Kosher certification) of the meals is considered Kosher by some, it does not meet the full standards of Orthodox Kosher. The meals are delivered with tape that reads, "If tape is removed, Kosher status may be voided." This tape is disturbed on at least six (6) cases of meals per pallet, the contents of which are damaged and opened at the institution warehouse. Main kitchen staff refuse to fix the issue despite repeated efforts by Plaintiff to fix the problem. Plaintiff is then served the non-Kosher meals by culinary Defendants.

6.      The served foods do not match the approved menu foods, neither by name nor quantity. Three-ounce bagels have been permanently replaced by 2-ounce or 2.5-ounce bagels. Replacements are the usual occurrence, and the very limited variety of foods is worsened when the few items are replaced with duplicates from the previous day. For example, on bagel day the bagels are stolen by culinary staff (inmates, despite efforts by Plaintiff to have the correct meal served) and replaced with the peanut butter and jelly meal that was saved from the previous day. CSC staff allow this practice to reward their workers as an "underground regulation." The bagels and other such items like cookies are taken back to the facility yard and sold. Correctional staff allow the inmate workers to take these items back to the housing units and facility. These Defendants are responsible for Plaintiff not receiving the nutrition Plaintiff should. The same is

true for dinner meals at the main kitchen. Main kitchen workers consume the more palatable meals and replace them with the open and otherwise inedible meals, i.e., if the chili meal is dropped onto the floor on Monday and spilled, it is used to replace a Wednesday meal (chicken patty) after being stowed away for two days in the main kitchen. In this way the meals are otherwise contaminated. The meals that are served are calorie rich and nutrient poor. The meals are basically bread, sugar, and spoiled meat.

7.     The foods served are past their expiration date and/or best-by date. All foods served in this way are poor, with mold growing on them, stale, with opened bread, exploded, waxy, etc. The foods have been taken directly to the supervisory staff – CSC, CSCII. Food Manager, Food Administrator, etc. – and in response the Plaintiff suffered retaliation. The future batches of meals no longer had dates on all the products and slowly the remaining products have had their dates removed from them. The labeling from ABC Ventures had the expiration dates removed (some of the dates were more than two (2) years past), and lot codes were issued. The food served to Plaintiff by Defendants is still bad. The individual food items do not often have a Kosher certification at all.

8.     The Kosher Diet Program (KDP) is intended to allow for Kosher-observant inmates like Plaintiff to eat their meals separate from non-Kosher meals. This is an important requirement in Kashrus. These issues have been raised with correction staff and sergeants several times and as a result Plaintiff suffered retaliation from Defendants repeatedly and the issue is not resolved. Procedures were changed to include others in the Kosher diet release to include diabetics, workers, students, and anyone who wishes to sneak out of the buildings during the release period. Even the issue of inmates sneaking out has been raised, to no avail. Defendants refuse to address the problem and there is further retaliation against Plaintiff, such as being forced to eat in contaminated areas with non-Koshers, and the forced discarding of Kosher meals and items.

Prayers, according to Orthodox law, require that persons of different faith be away while they are spoken. Plaintiff is forced to be seated with the unfaithful, thus preventing Plaitiff from saying the Holy and Sacred Prayers prior to meals. Meanwhile, the insurgents talk while eating,

spitting out their food onto KDP participants' meals, rendering the meals non-Kosher. Regularly, Plaintiff as a KDP is required to eat with Pagan and/or "Skinhead/White Power" individuals who intentionally cause difficulties for Plaintiff. Plaintiff has raised this issue with correctional and culinary staff (Defendants), to no avail, leaving Plaintiff at risk from the hateful anti-Semitic persons at meals.

9.      Plaintiff (KDP) is served whole meals and portions of regular non-Kosher meals in place of Kosher meals. Items include non-Kosher bread, etc. This is done by Defendants culinary staff and is done in particular when items from the Kosher meals are missing as the result of the theft of those items by inmate workers, and permitted by culinary staff (Defendants). So much of the Kosher food is stolen from the KDP that only non-Kosher replacements are available for Plaintiff. When replacements from the main kitchen are requested by Plaintiff, these requests are denied by both culinary staff and custodial staff (Defendants). Recently the salads that were the most nutritious parts of the Kosher diets have had the most nutritious items removed in retaliation by culinary staff for filing inmate grievances and CDCR 22's. Replacing the salad is a ball of shredded dry cabbage and two dirty radishes.

10.     After multiple pleas and appeals, Plaintiff has been given repeated excuses for the open, rotten, spoiled, uncooked, frozen, spilled, non-nutritious food, including regular blame of the vendor (ABC Ventures). Yet Defendants continue to order from the same vendor for five years. Plaintiff has filed appeals yet continues to face roadblocks such as cancellations (VSP-19-01146, VSP-19-01285, TLR 1908537 and others). For three years Plaintiff has been trying to resolve the issues with named Defendants culinary staff.

Requests for another supplier of Kosher foods were denied. Culinary and institutional, Statewide Religious Review Committee (SRRC), and policy staff all refused to address all these issues. Appeals to exchange rotten food were denied, appeals to have another vendor were denied, and appeals to have a back-up plan were denied. The KDP, including Plaintiff, have all collectively attempted to resolve every issue.

11.     Plaintiff is an inmate. Plaintiff suffered because of Items #1-10 (written above) and at all times was housed at Valley State Prison in the custody of the California Department of

Corrections and Rehabilitation and participating in the Kosher Diet Program (KDP) for reason of sincerely-held belief. Plaintiff is an Orthodox Jew.

Plaintiff believes that the law of the Bible is an instruction from our Father and Creator, and that Plaintiff has no choice but to adhere to the instruction given by Plaintiff's loving Father. The Teachings have been passed down from generation to generation starting with Moshe (Moses), whereupon they were received from God. The problems faced by Plaintiff have been caused by Defendants, each of them every day, and are accounted for from December 26, 2016 to December 20, 2019. The available Rabbi, P. Gordon, was made aware of the problems with the KDP by Plaintiff. The Rabbi confirmed the problems and agreed to investigate. Upon his investigation the Rabbi informed Plaintiff that these issues were being raised with the Religious Review Committee (RRC) but there has been no solution. The issues with staff were also raised, then forwarded to the Community Resource Manager (CRM), also to no avail.

1) Claim 1; U.S. Constitution, 1st Amendment:

a)      Free Exercise of Religion:

Plaintiff is daily denied the ability to observe Kosher. At the time of filing, this restriction from 1/26/16 totaled 1095 days and 3,285 meals/violations. Defendants have each failed to provide Kosher meals as required by the U.S. Constitution, existing decisional case law, and Jewish Kosher Law. There is no alternative to eating. A person must eat to survive and a Jew must eat only Kosher meals. No alternative readily exists for Plaintiff to receive daily Kosher meals.

Defendants CDCR and VSP (and therefore Raythel Fisher) are responsible for providing the religious needs of Plaintiff, and they have failed in this duty. Statewide Religious Review Committee (SRRC) members (Does #1, 2, and 3) are responsible for the creation and implementation of statewide programs to meet these needs and to provide healthy meals appropriate to meet both the nutritional and religious needs of Plaintiff, yet after multiple problems chose year after year to retain the same vendor that had been blamed for the problems of quality and contents. Defendants Knight, Thornton, and Fisher each personally reviewed the administrative appeals and made intentional decisions to either deny or ignore the problems as

they were reported to them personally and directly by grievances. Defendant Anderson personally took pride in his actions to intentionally contaminate and render Plaintiff's meals un-Kosher by handling his penis and wiping the external and internal components of the meals with the sweat from his genitalia, likewise with Doe #4.

Correctional officers contributed to this denial of the right to freely exercise Plaintiff's religion in a reasonable manner. C/O Paez personally stood at the serving window and actively prevented Plaintiff from seeking replacement foods on a regular basis, using threats and retaliation to quell calls for change in active coordination with culinary staff member Anguiano.

Correctional Officer and Defendant Keene maliciously forced KDP inmates such as Plaintiff to mix with the non-Kosher participants while stating, "So they think they're fu**ing special" and "I'm tired of these fu**ing Jews sitting all over the place."

Correctional Officer and Defendant Avila-Gonzales repeatedly confiscated the Yarmulkes of observant Jews in the dining hall and rummaged through Kosher meals contaminating them with her dirty groves used to search shoes and other objects. These issues were brought to Sergeants and Defendants Clements and Santoya in repeated face-to-face conversations whereupon Sergeant Clements publicly intimidated and embarrassed KDP inmates and then used retaliation, while Santoya repeatedly refused to correct the actions of his subordinates.

Culinary staff Chapas, Lucero, Marques, and especially Anguiano were the frontline refusers to replace spoiled and contaminated meals (and meals missing components) that were served to Plaintiff. While the above defendants were the supervisors of the inmate workers, they allowed the inmate workers to knowingly grossly contaminate the Kosher meals even after being made aware of the issue by Plaintiff. Defendant Cruz refused to send replacements (meals) and allowed for the theft of items inside the Kosher meals. Defendant Hayman and Defendant Moosebaur repeatedly responded to the KDP and did not resolve issues, neither in person nor in response to written inquiries. Moosebaur in particular refused to fix issues and even claims to have eaten the rotten meat and instructed Gann to eat it while watching. Defendant Mohktar received the CDCR 22's documenting the issues and in response retaliated by removing items

from the KDP's salads. Defendant Hernandez personally conducted interviews with Plaintiff and other KDP, answered CDCR 22's and CDCR-602's, personally choosing not to correct any of the issues presented in the documents and in the interviews. Defendant Hernandez chose not to change the food in conspiracy with other culinary and administrative staff, used the same vendor and did not investigate the practices leading to issues.

b)      Retaliation for:

Exercise of Religion, Free Speech, and Conspiracy

Plaintiff suffered retaliation for her exercise of religion, by insisting that her meals be kept Kosher and the subsequent complaints, grievances, and possibly this complaint in the near future. The retaliatory actions were done by state actors against Plaintiff because of the exercise of protected actions under the U.S. Constitution's First Amendment and was done for the purpose and did chill the exercise of that protected conduct. Defendants' actions did not serve any legitimate penological goal or interest. Several of the actions in #1-10 were done in concert with other actors (Defendants) who were not directly present at that time, but in a conspiracy to retaliate. Defendant Anderson, upon being confronted with his contamination of the meals by use of his genitalia, retaliated by encouraging others to do the same (Does #4).

Officer and Defendant Keene, in response to Plaintiff reporting her (Keene's) failure to follow procedure to Sergeant and Defendant Clements, responded by intentionally disturbing Plaintiff's prayers and micro-managing the eating arrangement to ensure that KDP inmates were forced to eat with the non-KDP in violation of the procedure. This action in combination with her demeaning language about Jews shows her prejudice and intent. She interfered with the religious practice of Plaintiff and retaliated.

Officer and Defendant Paez, in response to attempts to have spoiled meals exchanged at the dining hall, used threats of rules violation reports, retaliatory searches (that factually occurred), and threats to have Plaintiff removed from KDP. When Plaintiff raised the issue with Sergeant and Defendant Clements, Clements intimidated KDP inmates publicly as a group and made Plaintiff and other KDPs discard their meals that had been prepared for the conclusion of the fast (for the following day). Defendant Santoya, in response to Plaintiff's attempt to resolve

the various Kosher meal issues, denied Plaintiff the ability to participate in the Inmate Advisory Counsel, used adverse changes to the Kosher Meal policies to hinder observance, used his position to restrict corrective action, and instructed his subordinates to continue the disruptive behavior.

Defendant Mohktar, in response to receiving Plaintiff's complaints via CDCR 22 forms, decided to have the contents of the Kosher salads reduced and made it known that this action was specifically in retaliation via the KDPs King and Thomas who at that time worked for him. This was done with the intention that it would curb further reports of Kosher program failures.

In retaliation for repeated complaints and grievances, defendant Moosebaur (a vocally proud Neo-Nazi) told his workers (including inmates such as Israel Garcia-Trevino #AY-4957 and other "line backers") that they no longer needed to wear gloves or hair nets while working with the Kosher food. In addition, the meals that should have been used as replacements for spoiled meals were given to his favorite workers instead of being used as replacements causing Plaintiff to be forced to either eat spoiled meals or not to eat.

The training by Moosebaur extended to Defendant Anguiano and subsequently to Anguiano's 3rd watch inmate workers. When Plaintiff tried to have spoiled meat replaced, Defendant Anguiano accused Plaintiff and other KDP inmates of fraud, requiring that every Saturday night meal be opened in front of him – yet when Plaintiff was (and is) served rotten meat, Defendant Anguiano still refused to replace the meat. This action was public and demeaned and deterred further complaints and other such speech by Plaintiff, effectively chilling the exercise of this protected conduct. The practice of Saturday public meal opening continues.

2)      Claim 2: U.S. Constitution, 8th Amendment

a) Nutritionally Deficient Diet (Kosher Diet)

Inmates are not required to choose between two rights they are entitled to exercise, i.e. choosing to observe Plaintiff's faith (Kosher) or eating nutritionally adequate meals. Plaintiff has the absolute right to both, and defendants have a duty to provide the means. Currently, Plaintiff is suffering from a nutritionally deficient diet.

Food is a basic necessity of life and must be nutritionally adequate. The continuous deprivation of nutritious food for 5 years is not a short-term dilemma for the duration of an emergency. Each of the Defendants has an absolute duty to provide Plaintiff with nutritious diets that also comply with her religious needs. Plaintiff has instead been given a long-term diet consisting of high carbohydrate, high calorie food without adequate vitamins, minerals, healthy oils, etc., without supplementation.

Defendants have each played a role in the food chain. From the development of an inadequate menu based solely upon the number of calories and without consideration of nutrition, the use of highly processed food (reduces the nutritional value of otherwise healthy similarly-named items), and nutritionally deficient substitutions (i.e., food listed as chili lost its cheese replaced with water, beans were reduced to under 10 beans and replaced with water, diced tomatoes were replaced with a highly processed tomato paste mixed with a large volume of water devoid of nutrition.)

b)      Sanitation of meals

All meals served during the times mentioned herein were both ritually contaminated, rendering them non-Kosher, and literally contaminated making them unsanitary. From the serving environment to the intentional contamination by the restroom (i.e., feces, semen, urine, etc.) and the genital sweat from the touching of the genitalia by inmate workers under the supervision of Defendants Culinary Staff, Correctional Officers, Anderson, Does #4, and VSP Administration. The meals are served on unclean tables, both literally and ritually. Dirty water and rags are used. The actual policy is to use one time rags (clean) and a dedicated cleaner used only for the Kosher Tables. This procedure is not followed by inmate workers, nor is it enforced by the culinary staff or custodial staff. When raised to the aforementioned defendants, retaliation ensues in the form of further barriers to religious expression.

The aforementioned conditions are dangerous to the health of Plaintiff. In particular when the "restroom type" of contamination is exposed to the food and the eating areas are made dirty with rags and water (used to clean the floor) are the cleaning tools for the Kosher meals and

areas. Illness has occurred to the Plaintiff, in particular sickness of the digestive tract caused by the unsanitary conditions of the serving and eating area of Plaintiff.

Members of the SRRC (Defendants) have intentionally reduced the quality of the food for the purpose of deterring inmates such as Plaintiff from participation in the KDP as is required by Plaintiff's religion. This is a form of punishment and discrimination based upon Plaintiff's religion and belief, used to try and force Plaintiff to quit the KDP and give up on religious tenets as required by God of Plaintiff.

c)      Mental Health

The failures of the KDP have caused great anguish and mental pain to Plaintiff. To discover that Plaintiff's meals had been repeatedly contaminated by sweaty anus residue and semen was shocking and unfathomable. While Plaintiff took on the burden of keeping Kosher, suffering nutritional deficits, trying to follow tenets of Plaintiff's faith and the laws of God. The incredible malpractice of Defendants in their respective roles (from either directly conducting the acts, or after being made aware and failing to remedy the situation) and their failures to fulfill the daily dietary needs, and by ignoring or providing boilerplate responses to grievances and form 22's to Plaintiff and other KDP inmates, have all contributed to the great depression, anguish, and physical illnesses suffered by Plaintiff.

d)      The Conditions of Confinement are Grossly Disproportionate to the Crime

As outlined above, the treatment of Plaintiff is extremely poor, unconstitutional, and egregious. No one in these United States should ever be submitted to the treatment suffered by Plaintiff. Plaintiff has suffered as described, emotionally, spiritually, and physically as a result of Defendants as described in #1-10. The conditions of confinement do not further any penological goal. The conditions were raised repeatedly by Plaintiff and KDP and were deliberately ignored. These conditions affected the daily life (and continue to do so) of Plaintiff. Plaintiff suffered anxiety, depression, damaged teeth, poor nutrition, physical illness (vomiting, diarrhea, nausea, cramps, etc.). The circumstances were permitted to continue as a coordinated effort by the Defendants in conspiracy to ignore the problems. Defendants actively conspired to allow the conditions to continue. The discriminatory animus shown by the Defendants (with

13

emphasis by Anderson and Moosebaur) was egregious and shows example of the daily circumstances of Plaintiff's life trying to overcome the prejudice. The actions were meant to deprive Plaintiff of equal privileges and right to nutritious food served in a sanitary manner and the ability to observe necessary religious tenets. The motives are clear by the actions and statement of Defendants, and Defendants' actions have resulted in injury as described by Plaintiff.

Our American society does not tolerate such treatment such as the physical contamination of food as has occurred to Plaintiff. The acts of Defendants are degrading to Plaintiff and attack her dignity without cause.

3)    Claim 3: U.S. Constitution 14th Amendment:

a)    Significant Hardship:

Daily hunger is a significant hardship, as with nutritional deficiency. When Plaintiff cannot eat because of the food being contaminated or spoiled, it causes this hardship. The times Plaintiff does eat are essentially ineffective because the food is nutritionally deficient, loaded with unhealthy carbs and calorie dumps made from highly processed foods known to cause cancer.

Having to file this suit, spending over 3 years collecting data and filing grievances, form 22's, arguing with Defendants, risking and suffering retaliation is a hardship. Retaliatory searches caused Plaintiff to suffer a lack of safety in her assigned housing. VSP is a dormitory setting (crowded), and when a retaliatory search is conducted, allowable property is seized from Plaintiff's cell-mates with the intent and effect of causing strife, anger, and the very real potential threat of violence against Plaintiff. Plaintiff lives in stress, anxiety, and depression, suffering from the loss of sleep and fear due to Defendants.

To supplement the diet, Plaintiff must order additional foods or trade for them as ordered from the packages or canteen. This additional financial burden and hardship is placed on Plaintiff and Plaintiff's family. By trying to observe Kosher laws and exercise Plaintiff's right of free expression, Plaintiff must endure this hardship. These rights are protected by the U.S.

Constitution and cannot be taken away, so fundamental that they are inseparable no matter what process is used.

        b)      Discrimination:

Plaintiff has suffered discrimination from Defendants, members of the SRRC (Defendants) made decisions with intent that denied Plaintiff nutrition and sanitation in meals while using methods at their disposal to discourage the lawful participation in the Kosher Diet Program as guaranteed by law. The SRRC has deliberately chosen to order food from ABC Ventures, a known problem vendor that CDCR, VSP, and the Food Manager have blamed for the known problematic food. Defendants CDCR, VSP, and Raythel Fisher, Jr. created policies that deny KDP such as Plaintiff the ability to eat Kosher or even sanitary food. Those who are required to eat Kosher by their faith, Plaintiff, suffer because of these policies. Culinary staff fail to supervise their workers, and custodial staff refuse to admonish those found to contaminate food and actively conspire with culinary Staff (Defendants – both) to force Plaintiff to accept spoiled/contaminated food. RVR threats include refusal to obey orders, threats of inciting a riot, hunger strike initiation, and assault on staff. Muslim inmates do not suffer such prejudice and have no problems with their RMA meals.

Defendant Raythel Fisher, Jr., only allows access to the Rabbi one day a week for Plaintiff. Plaintiff has raised the issues with the Rabbi who investigated and decided that there were legitimate problems with the KDP and forwarded those issues to the RRC, Food Manager, CRM, and Warden (Raythel Fisher, Jr.). Defendant Fisher has disallowed Shabbat (Saturday) services and refuses to accommodate Shabbat work prohibition for Plaintiff, but permits the Muslim holidays to be observed, unlike the majority of holidays required by Jewish law. Likewise accommodations are readily made for the Christian services, whereas the two days of Rabbi access was reduced to one day.

Inmates Anderson and Does #4 actively hate against the Plaintiff by contaminating the Kosher food (Kosher is inherently a Jewish observation as it was delivered to the Jewish Nation by Moshe/Moses at Mount Sinai) and disrupting Kosher observance. Anderson uses words to

describe Plaintiff such as "Fake a** Mother Fu**ers," showing his racism, hate, and discriminatory intent that he acts upon.

///

Officers Keene and Avila-Gonzales (Defendants) and Sergeants Clements and Santoya (Defendants) display their prejudice with their words and actions. They have actively caused the inability to observe Plaintiff's faith. Keene has disrupted the KDP and vocally displayed her (Keene's) motivations and reasons that are not related to any legitimate penological interest. Avila-Gonzales targets Plaintiff for Plaintiff's faith to harass Plaintiff and confiscate Plaintiff's head covering (Yarmulke) that is explicitly permitted. When the staff issues are raised to their supervisors in face-to-face interactions Defendants Clements and Santoya refuse to act. Clements has publicly embarrassed KDP inmates with intimidation.

Defendant Moosebaur brags about how his family murdered the Jewish population in Germany. Moosebaur expresses his desire to "Kill all the Jews" and uses his position to intentionally disrupt the Kosher Diet Program by having the meals served to Plaintiff go rotten out in the elements, allowing his workers (with Defendant Cruz) to open and contaminate the meals while stealing the meals' contents (meals served to Plaintiff). Moosebaur tried to force Plaintiff and KDP to eat rotten food while he watched and laughed. Moosebaur is prejudiced and discriminatory. Defendant Anguiano likewise has taken an active role in taking away the ability of Plaintiff to eat suitable food. He was trained by Moosebaur to deny requests for replacement meals even when they are rotten, spoiled, spilled, open, contaminated, or otherwise unfit for consumption (or rendered non-Kosher). The actions of Defendants are discriminatory and resulted in the denial of protected conduct. Defendants acted in concert with one another to deter by force (Paez and Anguiano), with threats of retaliation.

Defendant Mohktar shows his discriminatory animus by intentionally reducing the nutritional content of the KDP and Plaintiff's food (the on-site prepared salads, by removing vegetables, etc.) in response to attempts to observe the Plaintiff's religious tenets. In addition, when the need for fasting arrives due to a mandated religious fast, defendants Mohktar and Fisher

disrupt this process despite approval from Sacramento (CDCR Headquarters) and the federal RTM as referenced by the D.O.M.

///

///

    4)    RLUIPA:

    a)    The aforementioned restrictions placed upon Plaintiff are barriers placed by individual decisions made by Defendants. The decisions do not serve any legitimate purpose. Allowing the contamination by the intentional spoiling of food, the prejudice and retaliation actions have no basis in legitimacy.

    b)    Defendants have placed a substantial burden on Plaintiff's ability to exercise Plaintiff's faith and follow the tenets of Plaintiff's religion. There is no compelling reason to do so, and it is not in the furtherance of a government interest. It is not the "least restrictive" manner to obtain any goal other than to hate on the faithful, such as Plaintiff.

    c)    Keeping Kosher (observing Kashrus) is a well-established "Central Tenet" of Plaintiff's faith. It is a mandatory requirement.

    d)    Prison officials have been made well aware of the inability of Plaintiff to keep Kosher and have taken no corrective action. Defendants do not care, except to harm Plaintiff. Defendants disregard the complaints of Plaintiff except to retaliate. When Plaintiff's food is served rotten, Plaintiff does not eat, and when the food is contaminated, it is only rarely exchanged. Plaintiff often does not eat, or only eats portions that are not contaminated. Plaintiff is always improperly fed. When fed Plaintiff is served nutritionally deficient food on a regular basis and is subject to discriminatory treatment by Defendants, both inmates and staff (culinary/custody).

    e)    Plaintiff has suffered emotionally, physically, and spiritually. The effect that Defendants' actions have had on Plaintiff are acute and lasting.

    f)    Plaintiff has a sincerely held belief that requires Plaintiff to eat only Kosher. Plaintiff's belief is Orthodox Judaism requiring Kosher.

    5)    State Tort Claims

a)      This court has jurisdiction over the state tort claims due to supplemental jurisdiction over the issues presented in the complaint.

b)      There is no 11th Amendment immunity because Plaintiff is a citizen1 of the State of California. Further, any immunity that may have existed is forfeited under the California Tort Claims Act (CTCA) since Plaintiff filed under the act and filed this complaint in compliance with CTCA and was instructed to file this complaint by the Government Claims Board.

c)      Defendants are sued jointly and severally for all state tort claims, in both their personal and professional manners.

d)      CCR 15 § 3054(a)(b)

Reasonable efforts to accommodate Plaintiff should have been made, but were not made, and instead efforts were made to deter Plaintiff from exercising Plaintiff's rights. Further religious awareness training was either not conducted or conducted only on paper. The staff regularly state that they are completely unaware of Jewish traditions and holidays. In fact, Plaintiff has been accused of inventing holidays and has been disrespected for observing religious tenets such as donning tzitzit, tefillin, and keeping Kosher.

e)      CCR 15 § 3054.2 (d-f) (g[1])

There is a requirement to adhere to KDP menus that has been ignored, and when the issue has been raised, culinary staff reprisal in the form of retaliation is the default response, or threats of force or retaliation. One of the KDP participants was accused of assaulting Officer Keene after speaking to her at a distance while limping with his walker, and he subsequently fell when he flinched as she made a violent gesture towards him (assault).[4]

Kosher Passover foods are to be provided, but due to contamination the foods provided were not Kosher, nor Kosher for Passover. Appropriate training is to be done with "all workers, custody and food service employees . . . supervisors, ordering, preparation, serving KDP." There has never been training for the inmate workers since the recording of this complaint. Custody has

---

[4] Plaintiff is unable to locate him since her Ad-Seg placement.

18

not received training, or it has only been a paper training, i.e., they lock down the program, go to the gymnasium and literally eat donuts, tell jokes, and sign a paper saying they were trained. The food service employees admitted they were untrained except by an annual verbal instruction from the Rabbi they had forgotten. The supervisory do not supervise, the ordering staff order non-nutritious food that is rendered non-Kosher, the preparation staff prepare non-Kosher food, the serving inmates handle their genitalia and refuse to wash their hands after using the restroom or change their gloves, and then handle the Kosher food, including fruits and vegetables that are often unwrapped. The review, procurement, storage, and distribution is greatly flawed. The foods are opened, stolen from, allowed to rot and fester, and otherwise contaminated.

    f)  CCR 15 § 3050(a)

  A wholesome, nutritionally balanced diet is not provided.

    g)  CCR 15 § 3052(a)(e)

  The food is to be handled in accordance with the Health and Safety Code of California (H&SC) § 113945 through § 114259.4 of the California Retail Food Code (CFC). The food is not, the sanitation is absent, gloves are not changed, hands are not washed after using the restroom, the trays are dirty, the tables are unclean, and vectors exist (pests and vermin).

  Workers are not trained nor expected to follow sanitation standards of the CFC. The workers do not follow those standards. Workers are not permitted to serve food until instructed in these standards and are required by administrative law to follow them, yet they do serve food, in violation.

    h)  CCR Title 3, Div. 2, Sub. 1, Article 2 § 901.1

  Condemnation and Retention of Product: The packaging of the Kosher foods is disturbed to a great extent. Ripped open, cut open, bacteria and mold growing in what is supposed to be vacuum sealed products. In part, these things are to be retained and not distributed. However, they are instead distributed. The vacuum sealed meats in particular, and the pastries.

    i)  CCR Title 3, Div. 2, Chapter 4, Sub. 2, Article 45 §1180.43(b)(2)(D)

  Meat inedible by humans – Identification: To identify food that is inedible to humans, one factor that is definite is "coarsely ground hard bone incorporated with the meat." The turkey

in the lunches served has coarsely ground hard bone incorporated into it. This bone has caused broken teeth and lacerations to the mouth and throat. This issue has been raised with Defendants several times by the Plaintiff, but Plaintiff has been ignored. This food when served presents an immediate danger when consumed. (Note also an 8th Amendment violation as conditions that failed to meet public health standards as in this section, 5d.)

j)      California Civil Code §52.1(b)

The lack of nutrition, harm from dangerous foods and subsequent broken teeth and sickness, retaliatory actions, threats of force and violence, allow for the damages in the amount of $25,000 per incident. While exercising a protected right, Plaintiff suffered at the hands of Defendants as outlined in the complaint.

k)      Tortious Actions of Defendants

As outlined, the intentional tortious actions of Defendants has caused harm to Plaintiff and as such, Plaintiff is entitled to compensation and damages.

As relief, Plaintiff requests monetary damages, including punitive damages, declaratory relief, and injunctive relief.

## III.   SUMMARY JUDGMENT BASED ON EXHAUSTION

### A.   Legal Standards

#### 1.   Statutory Exhaustion Requirement

Section 1997e(a) of the Prison Litigation Reform Act of 1995 (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Prisoners are required to exhaust the available administrative remedies prior to filing suit.  Jones v. Bock, 549 U.S. 199, 211, 127 S.Ct. 910, 918-19 (2007); McKinney v. Carey, 311 F.3d 1198, 1199-1201 (9th Cir. 2002). However, a prisoner who has fully complied with the PLRA's exhaustion requirement need not file an entirely new federal case simply because they had not exhausted when they filed their original federal complaint. Jackson v. Fong, 870 F.3d 928 (9th Cir. 2017); accord Saddozai v. Davis, --- F.4th ---, 2022 WL 1613616 (9th Cir. May 23, 2022.) Exhaustion

is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, <u>Booth v. Churner</u>, 532 U.S. 731, 741, 121 S.Ct. 1819 (2001), and the exhaustion

///

requirement applies to all prisoner suits relating to prison life, <u>Porter v. Nussle</u>, 534 U.S. 516, 532, 122 S.Ct. 983, 993 (2002).

"[T]o properly exhaust administrative remedies prisoners 'must complete the administrative review process in accordance with the applicable procedural rules,' [ ]—rules that are defined not by the PLRA, but by the prison grievance process itself." <u>Bock</u>, 549 U.S. at 218 (quoting <u>Woodford v. Ngo</u>, 548 U.S. 81, 88, 126 S.Ct. 2378, 2386, 165 L.Ed.2d 368 (2006)). <u>See</u> <u>also</u> <u>Marella v. Terhune</u>, 568 F.3d 1024, 1027 (9th Cir. 2009) ("The California prison system's requirements 'define the boundaries of proper exhaustion.'"). An untimely or otherwise procedurally defective appeal will not satisfy the exhaustion requirement. <u>Woodford</u>, 548 U.S. at 90. However, the Ninth Circuit has made clear: A grievance need not include legal terminology or legal theories unless they are in some way needed to provide notice of the harm being grieved. <u>Griffin v. Arpaio</u>, 557 F.3d 1117, 1120 (9th Cir. 2009). A grievance also need not contain every fact necessary to prove each element of an eventual legal claim. <u>Id.</u>

Moreover, the Ninth Circuit has recognized that a grievance suffices to exhaust a claim if it puts the prison on adequate notice of the problem for which the prisoner seeks redress. To provide adequate notice, the prisoner need only provide the level of detail required by the prison's regulations. <u>Sapp v. Kimbrell</u>, 623 F.3d 813, 824 (9th Cir. 2010) (citing <u>Bock</u>, 549 U.S. at 218). The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. <u>Id</u>; <u>Griffin</u>, 557 F.3d at 1120; <u>see</u> <u>also</u> <u>Bock</u>, 549 U.S. at 219 (citing <u>Johnson v. Johnson</u>, 385 F.3d 503, 522 (5th Cir. 2004) ("We are mindful that the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that they may be sued; the grievance process is not a summons and complaint that initiates adversarial litigation."). Thus, in this case, the grievance process used at Valley State Prison where Plaintiff was incarcerated defines the boundaries of proper exhaustion.

A prisoner may be excused from complying with the PLRA's exhaustion requirement if they establish that the existing administrative remedies were effectively unavailable to them. See Albino v. Baca (Albino II), 747 F.3d 1162, 1172-73 (9th Cir. 2014). When an inmate's administrative grievance is improperly rejected on procedural grounds, exhaustion may be excused as "effectively unavailable." Sapp, 623 F.3d at 823; see also Nunez v. Duncan, 591 F.3d 1217, 1224–26 (9th Cir. 2010) (warden's mistake rendered prisoner's administrative remedies "effectively unavailable"); Ward v. Chavez, 678 F.3d 1042, 1044-45 (9th Cir. 2012) (exhaustion excused where futile); Brown v. Valoff, 422 F.3d 926, 940 (9th Cir. 2005) (plaintiff not required to proceed to third level where appeal granted at second level and no further relief was available); Marella, 568 F.3d 1024 (excusing an inmate's failure to exhaust because he did not have access to the necessary grievance forms to timely file his grievance).  In such a case, "the inmate cannot pursue the necessary sequence of appeals." Sapp, 623 F.3d at 823.

### 2.    California Department of Corrections and Rehabilitation (CDCR) Administrative Grievance System

The Court takes judicial notice of the fact that the State of California provides its prisoners and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare."  Cal. Code Regs. tit. 15, § 3084.1(a) (2017).  The process is initiated by submitting a CDCR Form 602.  Id. at § 3084.2(a) (2017).

On January 28, 2011, California prison regulations governing inmate grievances were revised.  Cal.Code Regs. tit. 15, § 3084.7.  Now inmates in California proceed through three levels of appeal to exhaust the appeal process: (1) formal written appeal on a CDC 602 inmate appeal form, (2) second level appeal to the institution head or designee, and (3) third level appeal to the Director of the California Department of Corrections and Rehabilitation ("CDCR").  Cal.Code Regs. tit. 15, § 3084.7. Under specific circumstances, the first level review may be bypassed.  Id. The third level of review constitutes the decision of the Secretary of the CDCR and exhausts a prisoner's administrative remedies. See id. § 3084.7(d)(3).

Since 2008, medical appeals have been processed at the third level by the Office of Third Level Appeals for the California Correctional Health Care Services. A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to them. Butler v. Adams, 397 F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir. 2002). Since the 2011 revision, in submitting a grievance, an inmate is required to "list all staff members involved and shall describe their involvement in the issue." Cal.Code Regs. tit. 15, § 3084.2(a)(3).  Further, the inmate must "state all facts known and available to them regarding the issue being appealed at the time," and they must "describe the specific issue under appeal and the relief requested." Cal.Code Regs. tit. 15, § 3084.2(a)(4). Inmates now have thirty calendar days to submit their appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed." Cal.Code Regs. tit. 15, § 3084.8(b).

At the time of the events giving rise to the present action in 2016-19, California prisoners were required to submit appeals within thirty calendar days of the event being appealed. Cal.Code Regs. tit. 15, § 3084.8(b).  The process was initiated by submission of the appeal to the first formal level.  Id. at § 3084.7(a).  Three levels of appeal were involved, including the first formal level, second formal level, and third formal level.  Id. at § 3084.7.  A final decision at the third level[5] of review satisfied the exhaustion requirement under 42 U.S.C. § 1997e(a).  Id. at § 3084.7(d)(3); see Lira v. Herrera, 427 F.3d 1164, 1166 (9th Cir. 2005).

Until June 1, 2020, when California Code of Regulations Title 15, sections 3084 through 3084.9 were repealed and replaced with renumbered and amended provisions at sections 3480 through 3487, California state prisoners were required to use this process to satisfy § 1997e(a) and exhaust their claims prior to filing suit.  Woodford, 548 U.S. at 85 (2006); McKinney, 311 F.3d. at 1199-1201.  A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available to them. Butler, 397 F.3d at 1183; Bennett, 293 F.3d at 1098.

---

[5] The third level is sometimes known as the Director's level.

### 3.       **Motion for Summary Judgment for Failure to Exhaust**

The failure to exhaust in compliance with section 1997e(a) is an affirmative defense under which defendants have the burden of raising and proving the absence of exhaustion.  Bock, 549 U.S. at 216; Wyatt v. Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  On April 3, 2014, the Ninth Circuit issued a decision overruling Wyatt with respect to the proper procedural device for raising the affirmative defense of exhaustion under § 1997e(a).  Albino II, 747 F.3d at 1168–69.  Following the decision in Albino II, defendants may raise exhaustion deficiencies as an affirmative defense under § 1997e(a) in either (1) a motion to dismiss pursuant to Rule 12(b)(6)[6] or (2) a motion for summary judgment under Rule 56.  Id.  If the court concludes that Plaintiff has failed to exhaust, the proper remedy is dismissal without prejudice of the portions of the complaint barred by § 1997e(e).  Bock, 549 U.S. at 223–24; Lira, 427 F.3d at 1175–76.

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Albino II, 747 F.3d at 1169 ("If there is a genuine dispute about material facts, summary judgment will not be granted.")  A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  In judging the evidence at the summary judgment stage, the court "must draw all reasonable inferences in the light most favorable to the nonmoving party."  Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011).  The court must liberally construe Plaintiff's filings because she is a *pro se* prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

In a summary judgment motion for failure to exhaust administrative remedies, the

---

[6] Motions to dismiss under Rule 12(b)(6) are only appropriate "[i]n the rare event a failure to exhaust is clear on the face of the complaint."  Albino II, 747 F.3d at 1162.

defendants have the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." Albino II, 747 F.3d at 1172. If the defendants carry that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in their particular case that made the existing and generally available administrative remedies effectively unavailable to them." Id. The ultimate burden of proof remains with defendants, however. Id. "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." Id. at 1166.

In arriving at these findings and recommendations, the court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this court did not consider the argument, document, paper, or objection. This court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**B.**    **Undisputed Facts**

In accordance with Local Rule 260(a), Defendants submit the following Statement of Undisputed Facts with references to the supporting evidence.  Unless otherwise noted, the following facts are undisputed by the parties or as determined by the court based on a thorough review of the record.[7]

**UNDISPUTED FACTS**

**I.**    **Plaintiff Gann's Allegations Against Defendants**

| DEFENDANTS' UNDISPUTED FACT AND SUPPORTING EVIDENCE | PLAINTIFF'S RESPONSE AND SUPPORTING EVIDENCE |
|---|---|
| 1.    At all times mentioned in the First Amended Complaint (FAC), Plaintiff Gann | 1. Undisputed. |

---

[7] These facts are taken from Defendants' Statement of Material Undisputed Facts. (ECF No. 49-1.)  On March 7, 2022, Plaintiff submitted a response to Defendants' undisputed facts. (ECF No. 57.)  The court has considered all declarations and exhibits submitted in support of the parties' statements.

| | |
|---|---|
| was a California Prison inmate, housed at Valley State Prison.    See Gann's first amended complaint (FAC), ECF 20. | |
| 2.   Gann alleges that she must be served a kosher diet for religious reasons, but she did not receive proper kosher meals from approximately December 26, 2016, until she was transferred from VSP to CIM on or around September 20, 2021.   Gann's FAC, ECF 20: at pp. 5-11:2-25; 22:24- 26; see ECF 38, Notice of Change of Address, signed September 20, 2021. | 2.   Disputed: ". . . until she was transferred from VSP to CIM. . ."   The allegation time frame did not include any time beyond the original filing, while many more bad meals were served that verbiage does not find itself in the FAC, specifically in regards to transfer. Evidence:  FAC (First Amended Complaint).[8] |
| 3.   Gann alleges that from December 26, 2016 until she was transferred out of VSP, the kosher meals at VSP contained food that was rotten, spoiled, and otherwise unfit for human consumption.  Gann's FAC, ECF 20 at 5:2-5. | 3.   Disputed: ". . . until she was transferred out of VSP. . ."   The allegation time frame did not include any time beyond the original filing, while many more rotten, and spoiled meals were served beyond that time, verbiage does not find itself in the FAC, specifically in regards to transfer.   Evidence:   FAC (First Amended Complaint).[9] |

---

[8] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party.  Fed. R. Civ. P. Rule 56(a). Here, the parties' dispute of fact in UF 2 about the exact time frame during which Plaintiff did not receive proper kosher meals is not material for purposes of the court's analysis of Defendant's motion.  Therefore, UF 2 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

[9] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party.  Fed. Rules Civ. Proc. Rule 56(a). Here, the parties' dispute of fact in UF 3 about the exact time frame during which Plaintiff did not receive proper kosher meals is not material for purposes of the court's analysis of Defendants' motion.  Therefore, UF 3 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

| | |
|---|---|
| 4.   Alleged issues include meals with half-cooked, spoiled, or denatured meat; meats that had spoiled due to thawing and refreezing them during the delivery and distribution process; and meal components, such as applesauce, being open, spoiled, or contaminated.  Gann's FAC, ECF 20 at 5: 1-27. | 4.  Undisputed. |
| 5.  Gann also alleges that inmate workers steal items in the kosher meals.  Gann's FAC, ECF 20 at 6:1. | 5.  Undisputed. |
| 6.   Gann alleges that she complained to Defendants about this, but was told, "Too bad," and Defendants put Gann in danger by sharing her complaints with the inmate kitchen works.  Gann's FAC, ECF 20 at 6:1-12. | 6.  Undisputed. |
| 7.   Gann alleges that Defendants also allegedly caused inmate workers to wear their serving gloves to the restroom before using them for service.  Gann's FAC, ECF 20 at 6:10-12. | 7.  Undisputed. |
| 8.   Gann alleges that kosher meals are prepared or served in ways that do not accord with the mandates of Gann's religion, including: heating in non-kosher ovens; | 8.  Undisputed. |

.

| | |
|---|---|
| preparation by kitchen staff not trained in accordance with the California Retail Code or by a rabbi; and, on fasting days, the provision of all meals at once only for Defendants to instruct Gann to eat them within a specific time.  Gann's FAC, ECF 20 at 6-9: 1-25. | |
| 9.  Gann alleges that the only Jewish worker objected to the use of non-kosher ovens, but Moosbauer told him to "get in the oven" and made other threatening offensive statements about Jews.  Gann's FAC, ECF at 6:20-23. | 9.  Undisputed. |
| 10.  Gann alleges that she complained about these issues to Defendants directly and submitted grievances to no avail.   Gann's FAC, ECF 20 at 13:12-28. | 10.  Undisputed. |
| 11.  Gann alleges that Defendants blame the food vendor for issues, but nonetheless continue to order food from that vendor.  Gann's FAC, ECF 20 at 10-11:22-5. | 11.  Undisputed. |
| 12.   Following screening, the claims remaining in this action include: (1) violation of the Religious Land Use and Institutional Persons Act ("RLUIPA") against all Defendants; (2) violation of the First Amendment's Free Exercise Clause against all Defendants; (3) adverse conditions of confinement in violation of the Eighth Amendment against all Defendants;  (4) | 12.  Undisputed. |

failure to protect Gann from harm to her health in violation of the Eighth Amendment against Defendants Fisher and Moosbauer (food safety); and retaliation in violation of the First Amendment against Defendant Moosbauer only. The Court ordered that all remaining claims and defendants be dismissed.  Screening Order, ECF 20 at 2.

## II.     Plaintiff Gann's Administrative Grievances Related to the JKDP/KDP at VSP.

| | |
|---|---|
| 13.    Since August 1, 2008, the California Department of Corrections and Rehabilitation (CDCR) office of appeals (OOA) receives, reviews, and maintains all final-level appeals for non-health care issues.    Declaration of Howard E. Moseley in support of Defendants' Motion for Summary Judgment (Moseley Decl.) at ¶ 2. | 13. Disputed: . . ."(OOA) Receives, reviews, . . ."  The OOA does not necessarily receive all final level appeals.    Many final-level appeals are mailed by inmates and do not arrive at the OOA, and only select appeals are actually reviewed, many are considered exhausted after a period of time and are not responded to or a notice is mailed stating that the time has expired and adopt the local review.  Evidence:  Gann Declaration P.2[10] |
| 14.  When an inmate appeal is received by the OOA, it is assigned a tracking log number and entered into a computer system.    Moseley Decl., at ¶ 3. | 14.  Undisputed. |

[10] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party. Fed. Rules Civ. Proc. Rule 56(a). Here, the parties' dispute of fact in UF 13 about whether the OOA receives and reviews every final level appeal is not material for purposes of the court's analysis of Defendant's motion.  Therefore, UF 13 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

| | |
|---|---|
| 15.  An "Appeal History Report" is available in the computer system for each offender. Moseley Decl., ¶ 3. | 15.  Undisputed. |
| 16.  The Appeal History Report includes the following information: the offender's first and last, name, the offender's CDCR number, the appeal log number, the appeal issue, the appeal issue, the date the appeal was received, the underlying grievance log number (which includes the acronym of the institution or parole region where the underlying grievance arose), the date the appeal is closed, and the final disposition of the appeal.   Moseley Decl., ¶ 3. | 16.  Undisputed. |
| 17.  All offender appeals are reviewed and screened out or screened in by the OOA. Moseley Decl., at ¶ 4. | 17.  Disputed:  ". . . All offender appeals are reviewed and screened out or screened in by the OOA . . ."   Not all appeals, only the received final-level reviews.  Local or initial appeals are not reviewed by the OOA, many are not reviewed.   Evidence:   Gann Declaration P.2[11] |
| 18.   An appeal is screened out (and not | 18.  Disputed: ". . . if it does not comply with |

---

[11] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party.  Fed. Rules Civ. Proc. Rule 56(a). Here, the parties' dispute of fact in UF 17 about whether the OOA receives and reviews every offender <u>appeal</u> or only every <u>Third Level appeal</u> is not material for purposes of the court's analysis of Defendant's motion.  Therefore, UF 17 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

| | |
|---|---|
| answered substantively) if it does not comply with the regulations governing the appeal process. Moseley Decl., at ¶ 4. | the regulations . . .”   Appeals are often improperly screened out leaving no review for appealants/inmates regardless of regulation compliance.   Evidence:   Gann Declaration P.2[12] |
| 19.  If an appeal is screened out, the appeal is returned with a letter instructing the offender how to cure the deficiency, if a cure is possible. Moseley Decl., at ¶ 4. | 19.  Disputed:  “. . . returned with a letter instructing . . .”  Many times the appeals are discarded, and not returned, other times the appeal is returned without indication on repair information.   Evidence:   Gann Declaration P.3[13] |
| 20.  An appeal is screened in (and answered substantively)  if  it  complies  with  the governing regulations.  Mosely Decl., at ¶ 4. | 20.  Disputed:  “. . . an appeal is screened in (and answered substantively) if it complies with the governing regulations . . .”  Blatantly untrue, substantive answers are exceedingly rare, and compliance with regulation is often disregarded on behalf of CDCR, improperly screening appeals that do comply and not providing  response.   Evidence:   Gann |

<hr/>

[12] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party.  Fed. Rules Civ. Proc. Rule 56(a).  Here, the parties' dispute of fact in UF 18 about whether the OOA sometimes improperly screens out appeals regardless of the regulations is not material for purposes of the court's analysis of Defendant's motion.  Therefore, UF 18 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

[13] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party.  Fed. Rules Civ. Proc. Rule 56(a).  Here, the parties' dispute of fact in UF 19 about whether sometimes an appeal is not returned to the inmate, or sometimes is returned without a letter instructing the offender how to cure the deficiency is not material for purposes of the court's analysis of Defendant's motion.  Therefore, UF 19 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

| | Declaration P. 3-4[14] |
|---|---|
| 21.    The Appeal History Report includes appeals that were screened out or in; and if screened out, the report includes the reason for the screen-out. Moseley Decl., at ¶ 4. | 21.  Disputed:  ". . . Appeal History Report includes appeals that were screened out or in; and if screened out, the report . . ."  The Appeal History report only contains 'Some' of the appeals that were screened out.  Evidence: Gann Declaration P. 2[15] |
| 22. Decisions by the OOA represent the final level of review in the Department's grievance and appeal process and are rendered on behalf of the secretary of the department.  Moseley Decl., at ¶ 5. | 22.  Disputed:  ". . . OOA represents the final level of review . . ."  Grievances that are denied review at the local level and improperly screened repeatedly provide an impassible barrier to relief, in this occasion the appeal is rendered exhausted, such as in the circumstance of rejected appeals that cannot be further appealed.  Evidence:  Gann Declaration P. 1-2[16] |
| 23.  If filing a grievance before June 1, 2020, | 23.  Undisputed. |

---

[14] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party. Fed. Rules Civ. Proc. Rule 56(a). Here, the parties' dispute of fact in UF 20 about whether an appeal is always screened in and answered substantively if it complies with the governing regulations is not material for purposes of the court's analysis of Defendant's motion.  Therefore, UF 20 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

[15] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party. Fed. Rules Civ. Proc. Rule 56(a). Here, the parties' dispute of fact in UF 21 about whether the Appeal History Report contains every appeal that was screened out is not material for purposes of the court's analysis of Defendant's motion.  Therefore, UF 21 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

[16] Plaintiff asserts that sometimes appeals are improperly screened, but he has not disputed Defendants' statement in UF 22 that "decisions by OOA represent the final level of review in the Department's grievance and appeal process."  Therefore, UF 22 remains undisputed.

| | |
|---|---|
| an offender was required to follow the procedures set forth in CCR, title 15, sections 3084-3085 (repealed June 1, 2020). Moseley Decl., at ¶ 6. | |
| 24.   The OOA's records of appeals are maintained in the course of the regularly conducted activities of the OOA, and making and maintain records is a regular practice of those activities.  Moseley Decl., at ¶ 7. | 24. Undisputed. |
| 25.  A search of the OOA computer system was conducted on January 3, 2022, under the name Nathaniel Gann, CDCR No. G64542 for all non-health care related appeals received by the OOA.  Moseley Decl., at ¶ 7; see Exh. 1. | 25. Undisputed. |
| 26.  A search was conducted of the OOA's records to determine whether any appeals submitted by Gann and received on or after December 12, 2016, and before Gann initiated this action on December 16, 2019,[17] alleged that Defendants Fisher, Paez, Anguiano, Chapa, Lucero, Marquez, Cruz, or Moosbauer violated RLUIPA.  Moseley Decl., at ¶ 8. | 26. Undisputed. |
| 27.  A search was conducted of the OOA's records to determine whether any appeals submitted by Gann and received on or after | 27. Undisputed. |

[17] The Court's record shows that Plaintiff filed the Complaint initiating this action on December 26, 2019.  (ECF No. 1.)  Defendants' statement in the Undisputed Facts that the action was initiated on December 16, 2019, appears to be a typographical error and shall be disregarded by the Court.

| | |
|---|---|
| December 12, 2016, and before Gann initiated this action on December 16, 2019, alleged that Defendants Fisher, Paez, Anguiano, Chapa, Lucero, Marquez, Cruz, or Moosbauer violated the First Amendment Free Exercise Clause. Moseley Decl., at ¶ 8. | |
| 28.  A search was conducted of the OOA's records to determine whether any appeals submitted by Gann and received on or after December 12, 2016, and before Gann initiated this action on December 16, 2019, alleged that Defendants Fisher, Paez, Anguiano, Chapa, Lucero, Marquez, Cruz, or Moosbauer were responsible for Gann's alleged adverse conditions of confinement in violation of the Eighth Amendment on or after December 12, 2016. Moseley Decl., at ¶ 8. | 28.  Undisputed. |
| 29.  A search was conducted of the OOA's records to determine whether any appeals submitted by Gann and received on or after December 12, 2016, and before Gann initiated this action on December 16, 2019, alleged that Fisher and Moosbauer failed to protect Gann in violation of the Eighth Amendment on or after December 12, 2016.  Moseley Decl., at ¶ 8. | 29.  Undisputed. |
| 30.  A search was conducted of the OOA's records to determine whether any appeals | 30.  Undisputed. |

| | |
|---|---|
| submitted by Gann and received on or after December 12, 2016, and before Gann initiated this action on December 16, 2019, alleged that Moosbauer retaliated against Gann in violation of the First Amendment on or after December 12, 2016. Moseley Decl., at ¶ 8. | |
| 31.  On May 26, 2019, Gann and a nineteen other inmates at Valley State Prison submitted an inmate/parolee group appeal (group appeal).  Mosely Decl., ¶ 10, Exhibit Exh 3, pp. 12- 17. | 31.  Undisputed. |
| 32.  The group appeal was received by the inmate appeals division of Valley State Prison on May 28, 2019.  Mosely Decl., ¶ 10, Exhibit Exh 3, pp. 12- 17. | 32.  Undisputed. |
| 33.  The group appeal was assigned Log # VSP-B-19-01146.   Mosely Decl., ¶ 10, Exhibit Exh 3, pp. 12- 17. | 33.  Undisputed. |
| 34.  The group appeal, Log # VSP-B-19-01146, alleges as follows under section A. Explain your issue: "The JKDP/KDP (Jewish) Kosher Diet Program, is a complete failure. It does not comply with the Cooper Settlement, nor Jewish Kosher laws and traditions as required and agreed [sic] upon in the Cooper Settlement. Rotten, spoiled, and unfit for consumption food is being served, and not replaced. Food is transported, opened and | 34.  Undisputed. |

cooked in shared ovens/carts used for non-kosher food. Food is served in shared tray slot after nonkosher food. Food is handled and served by workers untrained in Kosher and CFC procedures. Food is to be eaten on unclean tables contaminated with un-kosher food when wiped down with dirty contaminated rags. No kosher utensils are provided. Cold and hot foods are improperly sealed, rendering them unsealed and open, not double wrapped) exposing the food during cooling and transportation. KDP's are denied meals when spoiled meals are served. Served food does not match the menu neither by name or by weight/quantity. AC Ventures is not an RTM approved Orthodox Kosher Certification (uses Triangle [sic] K.) Served food is either not dated or past the expiration date. Individual food items often do not have kosher hechsher (sic). Meals are neither wholesome nor nutritious, empty calories, bread and sugar. Fruits and vegetables are broken/cracked rendered un-kosher. KDP's eat and share the dining hall and sometimes tables with non-KPD's, regular eaters sneak out with the KDP. The prayerful are not permitted to self-segregate [sic] for the purpose of prayer. Attempts at resolution

| | |
|---|---|
| results in instant retaliation. Violations of CRC 15 S 3054.2 a, e, d-g, CCR 3 § 1180.43 (b)2((D). California Retail Food Code (CFC), OP Sec, I, IV, VI A.1, B.2, 3-6, D.1, 4.3-6, F.2.a-b, G.2.4. V (20003 Cooper Settlement), H&SC §113945-4259." Mosely Decl., ¶ 10, Exhibit Exh 3, pp. 12- 17. | |
| 35. The group appeal, Log # VSP-B-19-01146, was cancelled at the first screening level via a written, signed, and dated screening letter. Mosely Decl., ¶ 10, Exhibit Exh 3, p. 11. | 35. Disputed: ". . . written, signed, and dated . . ." The screening notice was not signed, there was a checked box. Evidence P. 3[18] |
| 36. The June 3, 2019 screening letter states, "The enclosed documents are being returned to you for the following reasons: Your appeal has been cancelled pursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(f). Unfortunately, this appeal cannot be accepted as a group appeal as each inmates issue with the Jewish Kosher Diet Program is different and therefore responses will vary on a case-by-case basis, as stated in Title 15, Section 3084.2(h)(4). You may notify the appellants that they may submit separate | 36. Undisputed. |

[18] A material fact is genuinely disputed if the evidence is such as would permit a reasonable fact finder to return a verdict for the nonmoving party. Fed. Rules Civ. Proc. Rule 56(a). Here, the parties' dispute of fact in UF 35 about whether screening letter was signed or there was a checked box is not material for purposes of the court's analysis of Defendant's motion. Therefore, UF 35 is not a genuinely disputed material fact and does not show that there exists a genuine issue for trial.

| | |
|---|---|
| appeals on their behalf.". Mosely Decl., ¶ 10, Exh 3, p. 11. | |
| 37.  On June 14, 2019, Gann submitted an inmate/parolee appeal, CDCR-602.  Mosely Decl., ¶ 9, Exh 2, pp. 3-6. | 37.  Disputed: ". . . Gann submitted an inmate/parolee appeal . . ." Gann submitted Two (2) appeals on that date. Evidence: Gann Deposition P. 3, Gann declaration P. 1,4; Evidence P. D[19] |
| 38.  Gann's June 14, 2019 inmate parolee appeal CDCR-602 was received by the inmate appeals division of Valley State Prison on June 17, 2019. Mosely Decl., ¶ 9, Exh 2, pp. 3-6. | 38.  Disputed: " . . . appeal CDCR 602 weas received . . ." Two (2) CDCR 602 were reviewed. Evidence: Gann Declaration P. 3, Evidence P. D[20] |
| 39.  Gann's June 14, 2019 inmate parolee appeal was assigned Log # VSP-B-19-01285. Mosely Decl., ¶ 9, Exh 2, pp. 3-6. | 39.  Disputed: ". . . inmate parolee appeal CDCR 602 was assigned . . ." Only 1 of the 2 inmate appeals was assigned a log number. Evidence:  Gann Declaration P. 3, Evidence P. D[21] |
| 40.  The subject of Gann's June 15, 2019 inmate/parolee appeal CDCR-602, Log # VSP-B-01285 was "the cancellation of CDC 602 VSP-B-19-01146." Mosely Decl., ¶ 9, | 40.  Undisputed. |

---

[19] Plaintiff has not disputed any part of fact UF 37, which says that on June 14, 2019, Gann submitted an inmate/parolee appeal, CDCR-602.  Therefore, UF 37 remains undisputed.

[20] Plaintiff has not disputed any part of fact UF 38, which says that his June 14, 2019 inmate parolee appeal CDCR-602 was received by the inmate appeals division of Valley State Prison on June 17, 2019.  Therefore, UF 38 remains undisputed.

[21] Plaintiff has not disputed any part of fact UF 39, which says that his June 14, 2019 inmate parolee appeal was assigned Log # VSP-B-19-01285CDCR-602.  Therefore, UF 38 remains undisputed.

| | |
|---|---|
| Exh 2, p. 3. | |
| 41.   Gann's June 15, 2019 inmate/parolee CDC 602, Log # VSP-B01285 was appealed to the office of appeals and assigned appeal Log No. 1908537.  Mosely Decl., ¶ 9, Exh 2, pp. 1-2. | 41.  Undisputed. |
| 42.   In Appeal Log No. 1908537, Gann alleged that "Neither 3094.6(F) nor 3084.2(h)(4) apply to the instant appeal. You misunderstood the [sic] the issue. The Kosher Diet Program is a failure for all in the group. While there many examples of the failure – only the examples that do apply to all are listed in the group 602. Individual issues were not listed. So you can see that under 3084.2(h) we are required to proceed as a group appeal, as this issue of the Kosher Diet Program has effected each of us, every example has happened to each and every one of us. There can be no individual or different responses because every example applies to all of us. By endorsing [sic] the original appeal, each signatory to the group appeal, did thereby attest to suffering all the harms alleged via appeal such that this erroneous cancellation basis misconstrues the factual predicate common among all appellants, and is not a pretext to obstruct/deny proper exhaustion | 42.  Undisputed. |

| | |
|---|---|
| aimed at artificially denying me and my fellow appellants proper legal standing to redress these harms via litigation." Mosely Decl., ¶ 9, Exh 2, pp. 3-6. | |
| 43.   There is no reference to Defendants Fisher, Paez, Anguiano, Chapa, Lucero, Marquez, Cruz, or Moosbauer in Gann's written appeal, Appeal Log No. 1908537. Mosely Decl., ¶ 9; Exh. 2, pp. 3-6. | 43.  Undisputed. |
| 44.  Gann's written appeal, Appeal Log No. 1908537, was received on July 17, 2019. Mosely Decl., ¶ 9; Exh. 2, p. 3. | 44.  Undisputed. |
| 45.  Gann's written appeal, Appeal Log No. 1908537 was denied on October 8, 2019, because cancellation of Grievance Log No. VSP-19-01146 was in compliance with the rules and regulations established by the CDCR. Mosely Decl., ¶ 9; Exh. 2, pp. 1-2. | 45.  Disputed: ". . . was in compliance with the rules and regulations . . ." The appeal was inappropriately denied because the grievance Log No. VSP-19-01146 was in error.   The relevant grievance should have been processed as a group appeal in accordance with the regulations.   Evidence:   Gann Declaration P. 4, Gann Deposition 16-37, Evidence P. D[22] |
| 46.  The findings for Appeal Log No. 1908537 are as follows: "The Third Level of Review (TLR) examined the issues of the appellant's appeal and reaffirms the institutions | 46.  Undisputed. |

---

[22] Plaintiff disputes UF 45, which states that the cancellation of Appeal VSP-19-01146 (Plaintiff's group appeal) was in compliance with CDCR's rules and regulations.  However, Plaintiff's evidence does not support her opinion and her opinion does not create a dispute of material fact.

| | |
|---|---|
| examination and conclusions as addressed with the [Second Level Review]. The appellant has failed to present evidence that the VSP staff acted in violation of any law, policies, or procedures. The appellant's filed group appeal was appropriately screened back to the appellant with instructions for the inmates who signed on to the appellant's filed group appeal to be informed they had to submit separate appeals themselves. The CCR 3084.2(h)(4), (4) states, 'An appeal shall not be accepted or processed as a group appeal if the matter under appeal requires a response to a specific set of facts (such as disciplinary and staff complaint appeals) that are not the same for all participants in the appeal. In such case, the group appeal shall be screened out and returned to the inmate or parolee submitting the appeal with directions to advise all those who signed the appeal attachment to submit individual appeals on their separate issues." Mosely Decl., ¶ 9; Exh. 2, pp. 2-3. | |
| 47.  Review of the OOA records shows that other allegations by Gann were processed through the final level of review after December 12, 2016, and before the filing of this lawsuit: 1) Appeal Log No. 170949; 2) Appeal Log No. 17055969; 3) 1707057; 4) | 47.  Undisputed. |

| | |
|---|---|
| 1709259; 5) 1709656; 6) 1710152; 7) 1711861; 8) 1715793; 9) 1804765; 10) 1910714; 11) 1915075; and 12) 1916286. Moseley Decl., ¶ 11 (a)-(l); Exh. 4-15. | |
| 48.  Among the appeal logs listed in UF # 47 (administrative appeals), none reference allegations that the JKDP/KDP is a complete failure.  Moseley Decl., ¶ 11 (a)-(l); see Exh. 4-15. | 48.  Disputed: ". . . None reference allegations that the JKDP/KDP is a complete failure . . ." Several other appeals mention the failure of the KDP, including Log No. VSP-B-19-01285. "The Kosher Diet Program is a failure", Final Review Number 1908537, 2d on the list in UF #47.  Evidence: Gann Declaration P. 4, Gann Deposition P. 26-37, Evidence P. D[23] |
| 49.  Among the appeal logs listed in UM # 47 (administrative appeals), none reference any claims that Defendants Fisher, Paez, Anguiano, Chapa, Lucero, Marquez, Cruz or Moosbauer violated RLUIPA.   Moseley Decl., ¶ 11 (a)-(l); see Exh. 4-15. | 49.  Undisputed. |
| 50.  Among the appeal logs listed in UM # 47 (administrative appeals), none reference any claims that Defendants Fisher, Paez, Anguiano, Chapa, Lucero, Marquez, Cruz or Moosbauer violated the First Amendment Free Exercise Clause.   Moseley Decl., ¶ 11 | 50.  Undisputed. |

---

[23] In her statement about UF 48, Plaintiff discusses Appeal no. VSP-B-19-01285/1908537 as one of the appeals listed in UF 47, but this appeal is not listed in UF 47.  Therefore, UF 48 remains undisputed.

| | |
|---|---|
| (a)-(l); see Exh. 4-15. | |
| 51.  Among the appeal logs listed in UM # 47 (administrative appeals), none reference any claims that Defendants Fisher, Paez, Anguiano, Chapa, Lucero, Marquez, Cruz or Moosbauer subjected Gann to adverse conditions of confinement in violation of the Eighth Amendment.  Moseley Decl., ¶ 11 (a)-(l); see Exh. 4-15. | 51.  Undisputed. |
| 52.  Among the appeal logs listed in UM # 47 (administrative appeals), none reference any claim that Fisher and Mossbauer failed to protect Gann in violation of the Eighth Amendment.  Moseley Decl., ¶ 11 (a)-(l); see Exh. 4-15. | 52.  Undisputed. |
| 53.  Among the appeal logs listed in UM # 47 (administrative appeals), none reference any claim that Moosbauer retaliated against Gann in violation of the First Amendment.  Moseley Decl., ¶ 11 (a)-(l); see Exh. 4-15. | 53.  Undisputed. |
| 54.  The OOA records also show that one unrelated appeal, Appeal Log No. 1800364, was received and screened out during the relevant timeframe.  Moseley Decl., ¶ 12; see Exh. 16. | 54. Disputed: ". . . one related appeal, Appeal Log No. 1800364, was received and screened out during the relevant timeframe . . ."  Additional appeal(s) were screened not listed in the OOA record referenced.  Evidence: |

| | Gann Declaration P. 1, 2, 3[24] |
|---|---|

## C.   <u>Defendants' Motion for Summary Judgment</u>

Defendants move for summary judgment under Federal Rule of Civil procedure 56 on the ground that there is no genuine dispute that Plaintiff failed to exhaust applicable administrative remedies against Defendants for Plaintiff's claims against them prior to filing suit as required by the PLRA, 42 U.S.C. § 1997e(a), and thus Defendants are entitled to judgment as a matter of law.

Defendants' evidence consists of the First Amended Complaint (ECF No. 20); Undisputed Facts (ECF No. 49-1); Declaration of Howard E. Mosely (Associate Director of the Office of the Appeals) (ECF No. 49-2) and its exhibits 1-16 (ECF No. 49-3), which include copies of Plaintiff's appeals, responses thereto, and other prison records; and, the Court's record. Defendants argue as follows.

First, a search was conducted of the office of appeals (OOA) records for appeals submitted by Plaintiff on or after December 12, 2016, and before the filing of this action on December 26, 2019 (mistakenly stated as December 16, 2019 by defendants), concerning Plaintiff's claims against Defendants. (Moseley Decl. ¶¶ 7, 8 & Exh. 1, ECF no. 49-2 at 3; 49-3 at 1-3.) Defendants found that on May 26, 2019, Plaintiff and nineteen other inmates submitted a group appeal, Log No. VSP-B-19-01146, complaining that the Jewish Kosher Diet Program (JKDP/KDP) is a complete failure. (<u>Id.</u> ¶ 10 & Exh 3, ECF No. 49-2 at 4, ECF No. 49-3 at 16-21.)  The group appeal was cancelled at the First Level of review on June 3, 2019, on the basis that a group appeal was not appropriate for this issue.  Plaintiff was advised to file her own separate appeal.  (<u>Id.</u> ¶ 10 & Exh. 2-A, ECF No. 49-2 at 4, ECF No. 49-3 at 15.)

Because Plaintiff used the grievance process for the group appeal, Defendants argue that the appeals process was available to Plaintiff and she was aware of it.

---

[24] Plaintiff asserts that UF no. 54 does not refer to the additional appeals that were received and screened out, but Plaintiff has not disputed the fact as stated in UF 54.  Therefore, UF 54 remains undisputed.

Instead of resubmitting a new separate appeal concerning the JKDP/KDP on Plaintiff's own behalf, Plaintiff filed an appeal on June 14, 2019, Log No. VSP-B-19-01285, contending that her appeal Log No. VSP-B-19-01146 was inappropriately cancelled. (Id. ¶ 9 & Exh 2, ECF No. 49-2 at 3-4, ECF No. 49-3 at 1-6.)  Plaintiff's appeal Log No. VSP-B-19-01285 (assigned appeal log #1908537) was denied at the Third Level of review.  (Id. ¶ 10 & Exh. 2, ECF No. 49-2 at 4, ECF No. 49-3 at 5-6.)

Defendants argue that only the claims concerning cancellation of Plaintiff's appeal were exhausted through the Third Level of Review, and therefore Plaintiff's claims in this action against Defendants for violations of RLUIPA, the First Amendment and the Eighth Amendment rights were not exhausted. (Id.)

Defendants found that other appeals filed by Plaintiff that were processed through the final level of review after December 12, 2016 but before the filing of this lawsuit, that none of these grievances allege that the JKDP/KDP (Jewish) Kosher Diet Program was a complete failure, or refer to any of the claims against the individual Defendants at issue in this lawsuit. (Id. ¶ 11 (a)-(l) & Exhs. 4-15, ECF No. 49-2 at 3-4, ECF No. 49-3 at 140-451.)

Defendants argue that prison officials were not on notice of Plaintiff's claims against Defendants in this case concerning the JKDP/KDP because Plaintiff did not complain of any wrongdoings by Defendants, or identify any of them in the group appeal, and no such claims have been reviewed at the Third and final level, and thus should be dismissed. (Id. ¶ 10 & Exh 3, ECF No. 49-2 at 4, ECF No. 49-3 at 11.)

### D.   **Defendants' Burden**

The court finds that Defendants have carried their initial burden to prove that there was an available administrative remedy and that Plaintiff failed to exhaust that remedy.  Therefore, the burden now shifts to Plaintiff to come forward with evidence showing that Plaintiff did exhaust the available remedies for her claims against Defendants, or that there is something in her particular case that made the existing and generally available administrative remedies effectively unavailable to her.

### E.   **Discussion**

In opposition to Defendants' motion for summary judgment, Plaintiff argues that she exhausted her administrative remedies for her claims in this case with Grievance Number VSP-B-19-01285/1908537, because she submitted the grievance for Third Level review and was provided a response informing her that "[t]his decision exhausts the administrative remedy available to the appellant within CDCR." (Moseley Decl., ¶ 9, Exh. 2, ECF No. 49-3 at 5-6.)  In addition, Plaintiff argues that she took extraordinary measures to ensure that prison officials were on notice regarding her claims.

Plaintiff's evidence includes her responses to Defendants' Undisputed Facts (ECF No. 57 at 13-17 (Exh. A)); her sworn declaration (ECF No. 57 at 19-22 (Exh. B)); her verified complaints (ECF Nos. 1, 20); her affidavit dated July 2, 2020 (ECF No. 57 at 53-56); copies of Plaintiff's form CDCR-22 inmate requests (ECF No. 57 at 25-30 (Exh. C)); copies of three appeals (ECF No. 57 at 31-44 (Exh. D)); copy of the response by the California Department of General Services concerning Plaintiff's state claim No. 19004717 (ECF No. 57 at 46 (Exh. E)); declarations of other inmates (ECF No 57 at 48-52 (Exh. F)); and, copies of excerpts from Plaintiff's deposition testimony (ECF No. 57 at 68-80 (Exh. G)).[25]

### 1.   Plaintiff's Claims.

There is no dispute that this case now proceeds only with Plaintiff's five claims in the First Amended Complaint:

**(1)   Violation of RLUIPA (Religious Land Use and Institutionalized Persons Act)**, against Defendants Warden Raythel Fisher, Jr., Dining Hall Officer Paez, and Culinary Staff Members Anguiano, Chapas, Lucero, Marquez, Cruz, and Moosebaur, in their official capacities;

**(2)   First Amendment Right to Free Exercise of Religion**, against Defendants Fisher, Paez, Anguiano, Chapas, Lucero, Marquez, Cruz, and Moosebaur, in their

---

[25] Plaintiff states that she filed her opposition without serving a subpoena or interrogatories on defense witness H. Mosley, but she reserves the right to supplement the opposition should the court grant permission.  Plaintiff is advised that the deadline for conducting discovery, including the serving of subpoenas and interrogatories, expired on March 21, 2022, thus the Court denies Plaintiff's request to supplement the opposition.

individual capacities;

(3)     **Failure to Protect Plaintiff in Violation of the Eighth Amendment**, against Defendants Moosebaur and Fisher;

(4)     **Conditions of Confinement in Violation of the Eighth Amendment**, against Defendants Fisher, Paez, Anguiano, Chapas, Lucero, Marquez, Cruz, and Moosebaur, in their individual capacities; and

(5)     **Retaliation in violation of the First Amendment**, against Defendant Moosebaur.

(ECF No. 30.)

///

## 2.     **Plaintiff's Grievances/Appeals**

The alleged incidents at issue in this case took place between **December 26, 2016**, (ECF No. 20 at 5 ¶1), and **December 26, 2019 (mistakenly stated as December 16, 2019 by defendants)**, when Plaintiff filed the initial Complaint for this case (ECF No. 1).

The parties do not dispute that an administrative remedy process was available to Plaintiff at VSP and that Plaintiff was aware of it and used it.  Plaintiff argues that she exhausted all of her available administrative remedies against Defendants prior to filing suit for her claims as required by the PLRA and regulations because since mid-2019 she filed three separate appeals regarding the Kosher food issues at Valley State Prison.  The parties do not dispute that only three of Plaintiff's grievances or appeals addressed the Jewish Kosher Diet Plan at Valley State Prison, which is the subject of Plaintiff's complaint in this action.[26]  Neither party disputes the following history of the three relevant appeals.

### (1)     **The First Appeal -- (Group Appeal)**

Plaintiff states that after several individual appeals were disregarded by officials and were not screened, answered, or returned, a group of inmates including Plaintiff opted to file a group appeal grieving joint issues about the Kosher Diet Program they shared.  The Group Appeal was

---

[26] The Court interchangeably refers to Plaintiff's appeals as either appeals or grievances.

submitted on May 26, 2019, by Plaintiff and nineteen other inmates at Valley State Prison, and assigned log no. VSP-B-19-01146. (Mosely Decl., ¶ 10, Exh 3, pp. 12- 17). According to Plaintiff, the Group Appeal intentionally omitted individual issues and only addressed shared issues about the Jewish Kosher Diet Program (JKDP or KDP) . (ECF No. 57 at 4:26-28.)

### (1) Appeal Log. No. VSP-B-19-01146, submitted on May 26, 2019

Food Services: Kosher Diet Program is Failure. (Jewish) Kosher Diet Program is a complete failure. It does not comply with the Cooper Settlement, nor Jewish Kosher Laws and Traditions as required and agreed upon in the Cooper Settlement. Human consumption food is being served, and not replaced. Food is transported, opened and cooked in shared ovens/carts used for non-Kosher food. Food is served in shared tray slot after non-kosher food. Food is handled and served by workers untrained in Kosher and CRC procedures. Food is to be eaten on unclean tables contaminated with un-kosher food and when wiped with dirty contaminated rags. No kosher utensils are provided. Cold and hot foods are improperly sealed, rendering them unsealed and open (not double wrapped) exposing the food during cooking and transportation. KSP's are denied meals when spoiled meals are served. Served food does not match the menu neither by name or by weight/quantity. ABC Ventures is not an RIM approved Orthodox Kosher Certification (uses Triangle K). Served food is either not dated or past the expiration date. Individual food items often do not have a Kosher Hexure. Meals are neither wholesome nor nutritious, empty calories, bread and sugar. Fruits and vegetables are broken/cracked rendered unkosher. KDP's eat and share the dining hall and sometimes tables with non-KDP's, regular eaters sneak out with the KDP. The prayerful are not permitted on occasion to self segregate for the purposes of prayer. Attempts at resolution results in instant retaliation. Violations of CCR 15 § 3054.2 a,e,d-g, CCCR 3 § 1180.43 (B) 2(D), California Retail Food Code (CFC), OP Sec. I, IV, VI A.1. B.2, 3-6, D.1, 4,3-6, F.2.a-b, G/2-4. V (2003 Cooper Settlement), H&SC §113945-4259.

(Decl. Mosely Exh. 3 at 84, ECF No. 49-3 at 84, 86; Decl. Plaintiff, Exh. D at 39, ECF No. 57 at 39-40.) On June 3, 2019, the Group Appeal was cancelled at the First Level of review. The screening letter provided to Plaintiff stated:

"The enclosed documents are being returned to you for the following reasons: Your appeal has been cancelled pursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(f). Unfortunately, this appeal cannot be accepted as a group appeal, as each inmates [*sic*] issue with the Jewish Kosher Diet is different and therefore responses will vary on a case-by-case basis, as stated in Title 15, Section 3084.2(h)(4). You may notify the appellants that they may submit separate appeals on their behalf."

(Mosely Decl., ¶ 10, Exh 3, p. 11.)

Plaintiff argues that the Group Appeal should not have been cancelled because it met every requirement for a Group Appeal. However, the Group Appeal was properly cancelled under the applicable regulation, which provides:

> "An appeal shall not be accepted or processed as a group appeal if the matter under appeal requires a response to a specific set of facts (such as disciplinary and staff complaint appeals) that are not the same for all participants in the appeal. §3084.2(h)(4). In such case, the group appeal shall be screened out and returned to the inmate submitting the appeal with directions to advise all those who signed the appeal attachment to submit individual appeals on their separate issues."

Title 15 of the California Code of Regulations § 3084.2(h)(4).

Plaintiff's Group Appeal was properly rejected because the facts about the Kosher Diet Program are not the same for all participants in the Group Appeal. Each of the individual plaintiffs in the Group Appeal has a different story to tell by alleging facts about their own experiences with each of the Defendants, including how each Defendant personally conducted themselves in violation of each individual plaintiff's rights. Therefore, the Group Appeal was not improperly cancelled.

Nonetheless, Plaintiff argues that the Group Appeal was improperly screened out and she should be excused from exhausting it to the Third Level of review because the improper screening caused exhaustion to be unavailable to her. The Court in Sapp, 623 F.3d at 823, carved out an exception to exhaustion if a grievance was improperly screened. To qualify for the exception, "a prisoner must show that he attempted to exhaust his administrative remedies but was thwarted by improper screening." Id. This showing requires an inmate to establish: (1) that he actually filed a grievance or grievances that, if pursued through all levels of administrative appeals, would have sufficed to exhaust the claim that he seeks to pursue in federal court, and (2) that prison officials screened his grievance or grievances for reasons inconsistent with or unsupported by applicable regulations. Id. at 823-24.

Proper exhaustion must be in accordance with applicable regulations and "demands compliance with [a prison's] deadlines and other critical procedural rules." Woodford, 548 U.S. at 90. The regulations in effect when Plaintiff filed her grievances required a grievance to:

> "[L]ist all staff member(s) involved and [] describe their involvement in the issue. To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question.

49

15 Cal. Code Regs. § 3084.2(a)(3).

Plaintiff's Group Appeal does not fall within the exception of <u>Sapp</u>. First, the Group Appeal did not comply with regulations requiring Plaintiff to include Defendants' names and therefore would not have sufficed to exhaust Plaintiff's claims. Second, prison officials screened out the Group Appeal for reasons consistent with the applicable regulations.

Plaintiff admits that she did not name any of the Defendants in her Group Appeal, but she responds that pursuant to <u>Valdez v. Walker</u>, No. CIV. S-08-01978 DAE, 2011, WL 1230890, at *4, (E.D. Cal. Mar. 30, 2011), she "was not required to name defendants, only provide enough information to take the appropriate response measures." As argued by Defendants, <u>Valdez</u> is not applicable here because the 602s at issue in <u>Valdez</u> were submitted over ten years ago when the administrative exhaustion procedures set forth in Title 15 did not contain any instructions requiring an inmate to identify the parties or individuals involved with the complained of activity, or instruct the inmate to provide any particular level of detail. Therefore, the 2011 Title 15 regulations are irrelevant to any 602s Plaintiff submitted in 2019 when proper exhaustion required Plaintiff to "[L]ist all staff member(s) involved and shall describe their involvement in the issue." 15 Cal. Code Regs. § 3084.2(a)(3).

However, cases in the Ninth Circuit have found that a prisoner's failure to list all staff members involved in an incident in their inmate appeal, or to fully describe the involvement of staff members in the incident, will not necessarily preclude exhaustion of administrative remedies. <u>Anderson v. Gonzales</u>, No. 114CV00362AWIBAMPC, 2017 WL 3226048, at *5 (E.D. Cal. July 31, 2017), <u>report and recommendation adopted in part, rejected in part,</u> No. 114CV00362AWIBAMPC, 2017 WL 4325773 (E.D. Cal. Sept. 29, 2017) (citing <u>McClure v. Chen</u>, 246 F.Supp.3d 1286, No. 1:14-cv-00932-DAD-GSA-PC, 2017 WL 1148135, at *2 (E.D. Cal. Mar. 28, 2017) (citing <u>Reyes v. Smith</u>, 810 F.3d 654, 658 (9th Cir. 2016); <u>Washington v. Guerra</u>, 2017 WL 1197861, at * 5 (C.D. Cal. Jan. 31, 2017), report and recommendation accepted

by, 2017 WL 1197667 (C.D. Cal. Mar. 29, 2017); <u>Bulkin v. Ochoa</u>, No. 1:13-cv-00388 DAD DLB PC, 2016 WL 1267265, at * 2 (E.D. Cal. Apr. 1, 2016)).

Relying on <u>Reyes</u>, 810 Fed.3d 654, Plaintiff reiterates that she exhausted her administrative remedies even though she did not name all of the Defendants (<u>Id.</u> at 3–4.).   In <u>Reyes</u>, the Ninth Circuit held that "a prisoner exhausts such administrative remedies as are available . . . under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process."   <u>Id.</u> (quoting <u>Reyes</u>, 810 F.3d at 658); <u>see also</u> <u>Bulkin</u>, 2016 WL 1267265, at *1–2 (declined to dismiss reckless endangerment claims based on failure to name two defendants in appeal because prison officials addressed the claim on the merits, were alerted to the problem, knew the actors involved, and were given an opportunity to rectify the alleged wrong).   However, in order to exhaust administrative remedies as to defendants who were not identified in an appeal, "there must be a 'sufficient connection' between the claim in the appeal and the unidentified defendants such that prison officials can be said to have had 'notice of the alleged deprivation' and an 'opportunity to resolve it.'"   <u>Id.</u> (quoting <u>McClure</u>, 2017 WL 1148135 at *3 (quoting <u>Reyes</u>, 810 F.3d at 659); <u>Franklin v. Lewis</u>, No. 13-cv-03777-YGR (PR), 2016 WL 4761081, at *6 (N.D. Cal. Sept. 13, 2016) (same)).   The circumstances in <u>Reyes</u> are different from the case at bar.   In <u>Reyes</u>, plaintiff made reference to the Pain Management Committee and alleged wrongdoing by its members.   <u>Id.</u> at 659.   The two unnamed individuals were part of that committee and thus, the <u>Reyes</u> court concluded, prison officials had full notice of the contours of his claim.   <u>Id.</u>   Nothing so specific was referenced in the grievances relevant to this case.   <u>Id.</u>   An unadorned reference to "correctional officers" simply does not provide the same type of indirect identification contemplated by <u>Reyes</u>.   <u>Id.</u>

Based on the foregoing, the Court finds that Plaintiff failed to show that she exhausted her administrative remedies with Appeal Log. No. VSP-B-19-01146, or that there is anything in her particular case that made administrative remedies effectively unavailable to her as to Appeal Log. No. VSP-B-19-01146.

**(2)     The Second Appeal**

On June 14, 2019, Plaintiff filed a second grievance, following prison officials' instructions in the screening letter cancelling the First Appeal. (Mosely Decl., ¶ 10, Exh 3, p. 11.)   Plaintiff referred to the Second Appeal as a "Solo appeal" and identified her issue as follows:

> **(2)      The Second Appeal – No Log no. assigned, submitted on June 14, 2019**
>
> I AGAIN am filing on the blatant failure at every level of the Kosher Diet program. I re-iterate everything in the group appeal (attached) with log number VSP-B-19-01146. Stop impeding my grievance/appeals.
>
> Stop the practice of preventing legal action and process my appeal.  Take care of the prejudice [*sic*] staff and the rotten food.  (See original group appeal), and yes this is a "Solo" appeal.

(ECF 57 at 44.) (emphasis in original)

Plaintiff submitted a copy of her First Appeal (Group Appeal) as an attachment to the Second Appeal.  No log number was assigned to the Second Appeal and it was rejected at the First Level of review for being a duplicate of Plaintiff's First Appeal.  Plaintiff was advised in the rejection notice:

> Brief Description of 602: Duplicate of VSP-B-19-01146.  Duplicate appeal/same issue. CCR 3084.6(c)(2).  Comment Section of CDCR 695: Duplicate appeal, no correction possible – rejected.

(ECF No. 57 at 43.)

Plaintiff argues that her attachments to the Second Appeal addressed her individual issues with the Kosher Diet Plan, but Defendants argue that Plaintiff's explanation of the issues in the attachments was simply a reiteration of the explanation provided in the cancelled Group Appeal and therefore not a supporting document as defined in subsection 3084(h) of Title 15.  The rules for supporting documents are found in 15 Cal.Code Regs. § 3084:

> Only supporting documents, as defined in subsection 3084(h), necessary to clarify the appeal shall be attached to the appeal.

15 Cal.Code Regs. § 3084.2(b)(1):

> Supporting documents do not include documents that simply restate the matter under appeal, argue its merits, or introduce new issues not identified in the present appeal form." Id.

15 Cal.Code Regs. § 3084(h).

The Court finds that Plaintiff's supporting document to the Second Appeal, a copy of the Group Appeal, did not allege facts about Plaintiff's individual encounters with each of the Defendants, including how each Defendant personally interacted with Plaintiff in violation of Plaintiff's rights, as Plaintiff was instructed.

Plaintiff argues that the Second Appeal was improperly screened because she had been told by officials to file the appeal again, but the staff refused to process the appeal and told her no correction was possible. As with the First Appeal, the Second Appeal does not fall within the exception of Sapp. Even if the Second Appeal had not been rejected as a duplicate appeal, it still would not have exhausted Plaintiff's claims if completed to the Third Level of review because it does not allege facts about Plaintiff's individual claims with each of the Defendants with respect to the Kosher Diet Program. Also, according to applicable regulations, prison officials did not screen the Second Appeal for reasons inconsistent with or unsupported by applicable regulations, which provide:

> [A]n appeal may be cancelled if "the appeal duplicates an inmate or parolee's previous appeal upon which a decision has been rendered or is pending."

15 Cal Code Regs § 3084.6(c)(2)

Moreover, Plaintiff did *not* follow prison officials' instructions when she filed her "solo" appeal. Plaintiff was instructed to submit a separate appeal on her own behalf that articulated what claims and allegations from the group appeal *specifically applied to her*. (emphasis added) Instead of following instructions, Plaintiff submitted a 602 appeal that did nothing more than reiterate the claims in the group appeal. (ECF 57 at 44 ("I reiterate everything in the group appeal (attached) with log number VSP-B-19- 001146."))

Plaintiff argues that pursuant to Holmes v. Estock,[27] she exhausted her remedies when her Second Appeal was rejected because inmates are not required to initiate more appeals. As argued by Defendants, the case law in Holmes does not support Plaintiff's contention that she exhausted her remedies. In Holmes, the Court adopted the "continuing violations" doctrine to

---

[27] Holmes v. Estock, No. 16CV2458-MMA-BLM, 2021 WL 568790 (S.D. Cal. Feb. 16, 2021).

issues of timeliness raised by an applicable statute of limitations.  <u>Holmes</u>, 2021 WL 568790, at

*16.  The exhaustion issues in Defendants' motion in the case at bar have nothing to do with

"continuing violations" or a statute of limitations defense.  As such, <u>Holmes</u> does not apply to

the facts in this case.

Plaintiff argues that in <u>Vaught v. Williams</u>,[28] the Court found that "there is no need for

duplicate appeals."  (ECF No. 57 at 2:10-12.)  Defendants respond that in <u>Vaught</u>, the Court

found that "[t]he policy underlying the PLRA exhaustion requirement would not be served by

requiring an aggrieved prisoner to bring a separate, largely duplicative round of administrative

appeals every time another administrative reviewer manifests the same type of alleged deliberate

indifference to the same type of medical claim."  (<u>Id.</u> at *7.)  Defendants argue that such is not

the case here.

Here, when the group appeal was cancelled the reviewer advised Plaintiff that,

"[u]nfortunately, this appeal cannot be accepted as a group appeal as each inmates' issue with

the Jewish Kosher Diet Program [JKDP] is different and therefore responses will vary on a case-

by case-basis as stated in Title 15, Section 3084.2(h)(4). You may notify the appellants that they

may submit separate appeals on their behalf."

Because the facts in this matter are clearly distinguishable from the facts in <u>Vaught</u>,

Defendants argue that the Court should ignore Plaintiff's reliance as well as her argument that

she is excused from exhausting her administrative remedies because there is "no need for

duplicate appeals."  Plaintiff argues that the solo appeal should not have been rejected as a

duplicate of her first appeal.  Defendants conclude that the Court should ignore Plaintiff's

reliance on <u>Vaught</u>.

Plaintiff asserts that this rejection inhibited her from pursuing an appeal to fix the Kosher

problem.  She contends that further review was not possible because prison officials refused to

---

[28] <u>Vaught v.</u> Williams, No. ED CV 17-1693-DOC(E), 2018 WL 4622030 (C.D. Cal. Aug. 21, 2018).

allow her appeals to proceed at the local level and so her appeals could not proceed to the final level of review.  However, Plaintiff nonetheless proceeded to file a Third Appeal.

Based on the foregoing, the Court finds that Plaintiff failed to show that she exhausted her administrative remedies with her Second Appeal, or that there is anything in her particular case that made administrative remedies effectively unavailable to her as to Second Appeal.

### (3)   **The Third Appeal**

On June 19, 2019, Plaintiff submitted a Third Appeal requesting that her cancelled Group Appeal be allowed to proceed.  The appeal of the cancellation of Log no. VSP-B-19-01146 was assigned Log no. VSP-B-19-01285.  It was appealed to the office of appeals and assigned appeal Log. No. 1908537 there.

### (3) Appeal No. VSP-B-19-01285/1908537, submitted on June 14, 2019

> Neither 3084.6(f) nor 3084.2(h)(4) apply to the instant appeal.   You misunderstand the issue.  The Kosher Diet Program is a failure for all in the group. While there are many examples of the failure – only the examples that do apply to all are listed in the group 602.  Individual issues were not listed.  So you can see that under 3084.2(h) we are required to proceed as a group appeal, as this issue of the Kosher Diet Program has effected [*sic*] each of us.  There can be no Individual or different responses because every example applies to all of us.

> By endorsing the original appeal, each signatory to the group appeal did thereby attest to suffering all the harms alleged via appeal such that this erroneous cancellation basis misconstrues the factual predicate common among all appellates [*sic*], and is but a pretext to obstruct/deny proper exhaustion aimed at artificially denying me and my fellow appellants proper legal standing to redress these harms via litigation.

(Moseley Decl., ¶ 9, Exh. 2, ECF No. 49-3 at 7-9; Exh. D to Pltf's Decl, ECF No. 57 at 37.)

The Third Appeal, which challenged Plaintiff's cancelled appeal, was denied at the Third Level of Review informing Plaintiff that "[t]his decision exhausts the administrative remedy available to the appellant within CDCR."  (Moseley Decl., ¶ 9, Exh. 2, ECF No. 49-3 at 5-6.) Plaintiff contends that no further recourse was available and this appeal notified officials of all of the Kosher issues in the complaint and had an attachment of all the original claims, as well as the cancellation.  Plaintiff states that she believed she had exhausted her remedies.  (See Gann

Declaration[29])  She asserts that even the Third Level of review addressed each and every Kosher issue, and they were attached and discussed at length during the appeal interview process.

Defendants contend that Plaintiff's attachments were not properly included as supporting documents.  The rules for supporting documents are found in 15 Cal.Code Regs. § 3084.1(b)(1): "Supporting documents do not include documents that simply restate the matter under appeal, argue its merits, or introduce new issues not identified in the present appeal form."  Id. (emphasis added.)  "Only supporting documents, as defined in subsection 3080(h), necessary to clarify the appeal shall be attached to the appeal."

Plaintiff was advised at the Third Level that her remedies were exhausted.  Plaintiff mistakenly believed that she had exhausted all of her remedies (see Gann Deposition[30]).  She asserts that the Third Level addressed each and every Kosher issue, which were attached and discussed at length during the appeal interview process.  She attached all of the original claims and a copy of the cancelled First Appeal believing that it informed officials of all her claims about Kosher food issues.  Plaintiff argues that no further recourse was available, and this appeal notified officials of all of the Kosher issues in the complaint.

Plaintiff also argues that she notified prison officials of her individual issues with the Kosher Diet Program during her interview after she filed the Third Grievance.  Plaintiff asserts that she was interviewed about the failings of the Kosher Diet Program for about an hour, and the interviewer agreed with Plaintiff.  According to Plaintiff the interviewer told Plaintiff that she (interviewer) would speak to her supervisor because she was told to deny the appeal and thought the signatories were not all members of the Kosher Diet Program.  Plaintiff alleges that she told the appeals interviewer the names of staff involved and raised every issue in detail during this process.  Plaintiff indicates that she was surprised when the appeal was denied.  This appeal had proceeded to the final level of review and Plaintiff was told in the Third Level response that her administrative remedies were exhausted.  Plaintiff states that she had every reason to believe

---

[29] Plaintiff refers the Court generally to her declaration, found at ECF No. 57 at 19-22.

[30] Plaintiff refers the Court generally to her deposition testimony, found at ECF No. 57 at 68-79.

that her appeal was exhausted and therefore her burden to exhaust administrative remedies before filing suit was met.

The appeal of the cancellation of Plaintiff's First Appeal was completed through the Third Level of review.  However, the cancellation decision at the Third Level did not constitute a decision on the merits that would satisfy the exhaustion requirement under Reyes, 810 F.3d 654. Wilson v. Zubiate, 718 F. App'x 479, 481 (9th Cir. 2017)  CDCR's third-level decision does not discuss the substance of Plaintiff's grievance.  Id.; See Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 501–02, 121 S.Ct. 1021, 149 L.Ed.2d 32 (2001) ("The original connotation of an 'on the merits' adjudication is one that actually 'pass[es] directly on the substance of [a particular] claim' before the court.") (quoting Restatement (Second) of Judgments § 19, comment at 161 (1980)).  A decision on the merits must discuss the substance of the grievance.  See Wilson, 718 Fed. Appx at 481-82.

Plaintiff argues that her appeals and other efforts gave adequate notice to the prison and Defendants of her claims against them.  While Plaintiff does not contest that her grievances fail to name any defendants, she argues that she thoroughly notified prison officials of the violations of her rights.

After Plaintiff filed her appeals she filed a claim with the California Department of General Services (CDGS), and on or about July 3, 2019, the claim was denied.  (ECF 57 at 8-13.)  The CDGS informed Plaintiff that she could initiate a court action if she chose to pursue the matter further.  However, in this case none of Plaintiff's claims are state claims and therefore her claim submission to the CDGS is immaterial to the outcome of this motion for summary judgment.

Plaintiff argues that there is no doubt that officials were placed on notice – she took extraordinary measures and also submitted numerous CDCR-22 form Requests.  The various CDCR-22 forms were delivered to various staff members and a correctional food manager, etc. Plaintiff contends that there is no argument that state officials were denied the opportunity to remedy the problem internally.  She argues that she met the exhaustion requirement again, contending that these CDCR-22 forms are sufficient to exhaust her administrative remedies.

However, pursuant to Title 15, section 3086 (h)(i), "an inmate or parolee's documented use of a Request for Interview, Item or Service form does not constitute exhaustion of administrative remedies as defined in subsection 3084.1(b)." Furthermore, the CDCR-22 forms attached to the Plaintiff's opposition do not name or identify all of the Defendants and would not have put Defendants on notice.

Defendants argue that some of the cases cited by Plaintiff in support of her arguments do not apply to the case at bar.  Beltran v. O'Mara, 405 F. Supp. 2d 140, 150 (D.N.H. 2005); Crawford v. Clarke, 578 F.3d 39 (1st Cir. 2009);  Grenning v. Klemme;  34 F. Supp. 3d 1144 (E.D. Wash. 2014); Norwood v. Robinson, 436 F. App'x 799 (9th Cir. 2011); Hudson v. Dennehy, 538 F. Supp. 2d 400 (D. Mass. 2008), Blake v. Ross, 787 F.3d 693 (4th Cir. 2015); Powers v. Corr. Corp. of Am., No. CV1501396PHXROSDMF, 2016 WL 11658180 (D. Ariz. Aug. 3, 2016); and Johnson, 383 F.3d 503.  Defendants argue that these cases are not persuasive authority and the Court is not bound by them. Defendants contend that more importantly, unlike Plaintiff's 602s, the internal grievances at issue in these lawsuits originated out of prisons and institutions located in Arizona, Massachusetts, Texas, Washington, and New Hampshire, and were therefore not regulated by Title 15 of the California Code of Regulations.  Because these cases concern exhaustion requirements related to prisons and institutions outside of California and the CDCR, and thus not regulated by Title 15, Defendants conclude that these cases and opinions cited in Plaintiff's opposition are not applicable to the facts of her case.  The Court finds that Defendants' arguments meritorious.

Plaintiff appears to argue that she was somehow treated unfairly during the grievance process and was prevented by prison officials from exhausting her appeals to the final level of review.  An inmate need only exhaust "available" administrative remedies.  See Ross v. Blake, 136 S.Ct. 1850, 1858 (2016).  "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"  Id. at 1859 (quoting Booth, 532 U.S. at 738).  When prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation, such interference with an inmate's pursuit of relief renders

the administrative process unavailable.  In Woodford, the Supreme Court recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) in order to "trip[ ] up all but the most skillful prisoners." Ross, 578 U.S. at 644) (citing Woodford, 548 U.S. at 102)).  "And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures." Id.

Under the PLRA, administrative exhaustion might be excused where repeated rejections of an inmate's grievances at the screening stage give rise to a reasonable good faith belief that administrative remedies are effectively unavailable.  Sapp, 623 F.3d 813.  Courts in other Circuits have held that administrative remedies were not "available" for purposes of the PLRA based on improper conduct by officials.  Nunez, 591 F.3d at 1229–30 (citing see, e.g., Turner v. Burnside, 541 F.3d 1077, 1081, 1085 (11th Cir. 2008) (holding that administrative remedies were unavailable where the warden tore up prisoner's initial grievance in front of the prisoner and threatened to transfer the prisoner away from his family if the prisoner continued to file such grievances); Kaba v. Stepp, 458 F.3d 678, 686 (7th Cir. 2006) (holding that administrative remedies were not available where the prison official warned the prisoner not to file a grievance and successfully pressured other inmates to assault the prisoner in order to prevent the prisoner from pursuing the grievance); Brown v. Croak, 312 F.3d 109, 112–13 (3d Cir. 2002) (holding that a complaint was sufficient to survive a motion to dismiss for failure to exhaust where prisoner alleged that prison officials told him he could not file a formal grievance until the completion of an investigation, but failed to tell him when that event occurred); Miller v. Norris, 247 F.3d 736, 738, 740 (8th Cir. 2001) (holding that the prisoner's allegation and evidence that prison officials refused to mail the prisoner the required administrative forms was sufficient to raise an inference that he had exhausted available remedies); cf. Panaro v. City of N. Las Vegas, 432 F.3d 949, 952–53 (9th Cir. 2005) (holding that pretrial detainee must allege that the detention center's grievance process was "systematically unavailable to him").

As previously discussed, when Plaintiff's First Appeal (Group Appeal) was screened out, prison officials advised her that she could submit a new appeal concerning the Jewish Kosher

59

Diet Program on her own behalf.  Then, when she filed the new appeal officials rejected it as duplicative of her first appeal.  Plaintiff argues that she followed instructions and when the Second Appeal was rejected as duplicative, she had no other remedy available to her.

However, Plaintiff did not follow the instructions she was given.  The instructions clearly advised Plaintiff that her Group Appeal could not be accepted as a group appeal because each of the individual inmate's issues with the Jewish Kosher Diet is different and therefore should be addressed case-by-case in separate appeals filed by appellants on their own behalf.  Yet Plaintiff proceeded to file another appeal admittedly "re-iterat[ing] everything in the group appeal (attached) with log number VSP-B-19-01146."  (ECF No. 57 at 4.)  Instead of following instructions to file an appeal addressing her own personal facts taking issue with the Jewish Kosher Diet Program, Plaintiff filed a new appeal that restated the claims in the Group Appeal which, according to Plaintiff, "in great deal outlined all the problems with the Kosher meals that were shared by the inmates, individual issues and personal issues [] omitted intentionally." (ECF No. 57 at 4:26-28.)  Then, when she filed the new appeal, officials rejected it on June 17, 2019 as duplicative of her first appeal.

MOST IMPORTANTLY, the law in this area is clear, the obligation to exhaust available remedies persists as long as some remedy remains available (see, Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005).  Here, even if arguably the group appeal was improperly screened out, which the court finds was not, all Plaintiff needed to do was follow the instructions set forth in the decision rendered at the 3rd level of Review pertaining to Appeal log # 1908537 (see above).  Plaintiff failed to follow this instruction and cannot now argue that no further remedies were available to her following that Review.

The rejections of Plaintiff's First and Second Appeals at the screening stage, described above, do not give rise to a reasonable good faith belief that administrative remedies were effectively unavailable due to the improper conduct of prison officials.  In this case, Plaintiff has not shown evidence of such improper actions by prison officials.

Based on the foregoing, the Court finds that Plaintiff did not exhaust her administrative remedies for the claims at issue in this case, nor was Plaintiff excused from the requirement to

exhaust remedies. Therefore, Defendants' motion for summary judgment should be granted, and this case should be dismissed.

**IV.    CONCLUSION AND RECOMMENDATIONS**

The Court finds, based on the record before it, that Plaintiff failed to exhaust her available administrative remedies for her claims in this case against Defendants, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).  Plaintiff also failed to submit any competent evidence sufficient to create a genuine dispute for trial that Plaintiff exhausted her remedies. Therefore, Defendants' motion for summary judgment, filed on January 28, 2022, should be granted and this case dismissed without prejudice.

Accordingly, based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants' motion for summary judgment, filed on January 28, 2022, be GRANTED;

2.    This case be DISMISSED, without prejudice, based on Plaintiff's failure to exhaust available administrative remedies before filing suit; and

3.    The Clerk be directed to CLOSE this case.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  **Within fourteen (14) days** after being served with these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 11, 2022**            **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE